LAWRANCE A. BOHM, (SBN 208716)
BRADLEY J. MANCUSO, (SBN 285616)
BOHM LAW GROUP
4600 Northgate Blvd., Suite 210
Sacramento, CA 95834
Phone (916) 927-5574
Fax (916) 927-2046

Attorneys for Plaintiff
CHRISTIAN HEAD, M.D.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTIAN HEAD, M.D., | Case No. 2:14-cv-01563-SVW-PLA |
| Plaintiff, | **PLAINTIFF'S SECOND AMENDED COMPLAINT FOR DAMAGES:** |
| v. | |
| ROBERT McDONALD, Secretary, Department of Veterans Affairs, Agency; DONNA M. BEITER, R.N., M.S.N., an individual; DEAN NORMAN, M.D., and individual, | **1) DISCRIMINATION**<br>**2) RETALIATION/REPRISAL**<br>**3) HOSTILE WORK ENVIRONMENT**<br>**4) 42 U.S.C. § 1985(2)** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, CHRISTIAN HEAD, M.D., respectfully submits the instant Second Amended Complaint for Damages and Demand for Jury Trial and alleges as follows:

## CASE OVERVIEW

DR. CHRISTIAN HEAD is a prominent Head and Neck Surgeon, known worldwide. As some would say, "one of our finest surgeons in Southern California. . . . [Who is] generous with his time and talent, helping Veterans and giving back to our community both locally and nationally. . . . [W]ho will make a difference in our world with his skills as a surgeon, his scientific research and laboratory." Unfortunately, DR. HEAD has been the victim of outrageous racial harassment, discrimination, and retaliation occurring within the West Los Angeles Campus of the VA Greater Los Angeles Healthcare System. Sadly, this illegal treatment has caused DR. HEAD severe financial and emotional harm. Furthermore, DR. HEAD has endured blatant

1

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

1   retaliation in an attempt to deter Plaintiff by force, intimidation, or threat from testifying freely in

2   his pending lawsuit against the VA.

3   **PARTIES AND JURISDICTION**

4   1.   Plaintiff, CHRISTIAN HEAD, M.D. (hereafter "DR. HEAD" or "Plaintiff"), was at

5   all times relevant to this action, a member of the medical staff and employee of the West Los

6   Angeles Campus of the VA Greater Los Angeles Healthcare System (hereafter "GLAHS" or

7   "Defendant").   While employed by GLAHS, and at all times relevant to this action, Plaintiff

8   worked in Los Angeles County.

9   2.   Defendant   ROBERT   McDONALD,   SECRETARY,   DEPARTMENT   OF

10   VETERANS AFFAIRS ("VA"), is an Agency of the Federal Government. Plaintiff is informed

11   and believes and based thereon alleges that defendant VA operates under general law powers. It is

12   a covered employer with obligations arising under *Title VII, 42 U.S.C. § 2000e.*

13   3.   Defendant, DONNA M. BEITER, R.N., M.S.N. ("DIRECTOR BEITER"), is a

14   licensed nurse and a member of the United States Senior Executive Service and is currently

15   serving as the Director of GLAHS.   Plaintiff believes, and thereby represents that, DIRECTOR

16   BEITER is a resident of Los Angeles County, California.

17   4.   Defendant, DEAN NORMAN, M.D. ("DR. NORMAN), is a licensed physician and

18   was appointed Chief of Staff for GLAHS in December 1999.   DR. NORMAN is responsible for

19   managing all of GLA's clinical, educational, and research operations.   Plaintiff believes, and

20   thereby represents that, DR. NORMAN is a resident of Los Angeles County, California.

21   5.   Jurisdiction is proper in this Court as this action arises under federal law: for

22   example, provisions of *Title VII, 42 U.S.C. § 2000e* and *42 U.S.C. § 1985(2).*

23   6.   At all times relevant, each and every Defendant was an agent and/or employee of

24   each and every other Defendant.   In doing the things alleged in the causes of action stated herein,

25   each and every Defendant was acting within the course and scope of this agency or employment,

26   and was acting with the consent, permission, and authorization of each remaining Defendant.   All

27   actions of each Defendant as alleged herein were ratified and approved by every other Defendant

28

2

Plaintiff's Second Amended Complaint for Damages                                      Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                                    Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                             BOHM LAW GROUP

1  or their officers or managing agents.

2         7.     Plaintiff has properly exhausted his administrative remedies.   Under 29 CFR

3  1614.407(d), a complainant is entitled to file a civil action in an appropriate United States District

4  Court if more than 180 days have elapsed since the filing of his discrimination complaint and final

5  action has not yet been taken by the EEOC Agency.  Plaintiff satisfied his filing obligations at the

6  VA EEO.  Plaintiff was deemed to have filed his initial contact and his formal complaint at the VA

7  within the requisite 45 days of the alleged acts of discrimination and retaliation.  The matter was

8  investigated in Plaintiff's favor.  Plaintiff's complaint was deemed timely and properly filed.  More

9  than 180 days have elapsed since the EEO closed its case and Plaintiff is entitled to file this civil

10  action.

11                      **STATEMENT OF FACTS**

12         8.     DR. HEAD obtained his Doctor of Medicine degree from Ohio State University,

13  College of Medicine in 1993.  Between 1992 and 1993, DR. HEAD completed an Internship in

14  Surgery at the University of Maryland at Baltimore.   Between 1994 and 1996, DR. HEAD

15  commenced his employment with a Fellowship in Neuro-Otology Research at UCLA School of

16  Medicine.  Between 1996 and 1997, DR. HEAD completed a Surgical Internship at UCLA School

17  of Medicine.  Between 1997 and 2002, DR. HEAD worked as a Resident in the UCLA School of

18  Medicine Head and Neck Surgery Department.   In 2002, DR. HEAD joined the faculty as a

19  Visiting Professor in Head and Neck Surgery at UCLA.  In 2002, DR. HEAD also joined GLAHS.

20  During his time with GLAHS, DR. HEAD worked as a Head and Neck Surgeon and as Associate

21  Director, Chief of Staff, Legal and Quality Assurance ("QA").  In August 2003, DR. HEAD joined

22  the faculty of the UCLA Geffen School of Medicine as a full time Head and Neck Surgeon.  DR.

23  HEAD has been board certified in Head and Neck Surgery since June 2003.

24         9.     Over the years, DR. HEAD's work has included clinical practice, surgery,

25  academia, and research for REGENTS.  DR. HEAD has received accolades for his work, including

26  the National Institute for Health–National Cancer Institute Faculty Development Award.  In or

27  around 2001 to 2002, DR. HEAD was nominated for the UCLA Medical Center Physician of the

28

3

Plaintiff's Second Amended Complaint for Damages                                     Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                   Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                    BOHM LAW GROUP

1  Year award.  In or around November 2003, DR. HEAD launched the UCLA Jonsson Cancer
2  Center Tumor Lab, which has been tremendously successful, yielding valuable research and
3  benefitting many physicians and patients at UCLA and worldwide.  In 2003, DR. HEAD was one
4  of a few surgeons nationwide to receive the Faculty Development Award from the National
5  Institute of Health Comprehensive Minority Biomedical Branch, intended to increase the number
6  of minority physicians in cancer research at major academic institutions.

7         10.    UCLA has several affiliated hospitals, one of which includes GLAHS.  As part of
8  this affiliation, UCLA provides physicians to staff GLAHS.  Until his departure from UCLA in
9  July 2013, DR. HEAD worked at both entities under this UCLA/GLAHS affiliation.  Furthermore,
10  many of the physician's responsible for the illegal treatment against DR. HEAD held dual
11  appointments at both UCLA and GLAHS, thereby serving as federal VA employees at all times
12  relevant to this action.

13        11.    DR. HEAD's supervisors include Marilene Wang, M.D. ("Dr. Wang"),
14  UCLA/GLAHS Head and Neck Surgeon and DR. HEAD's immediate supervisor at GLAHS; DR.
15  NORMAN, GLAHS Chief of Staff, Matthias Stelzner, M.D. ("Dr. Stelzner"), GLAHS Chief of
16  Surgical Services, and GLAHA DIRECTOR BEITER.  DR. HEAD also worked at GLAHS with
17  Keith Blackwell, M.D. ("Dr. Blackwell"); Joe Lee, M.D. ("Dr. Lee"); Ben Crane, M.D. ("Dr.
18  Crane"), who was performing his rotation at GLAHS at the time of the 2006 roast; Veling Tsai,
19  M.D. ("Dr. Tsai"), who worked as both a resident and attending at GLAHS; and Mark Levy, M.D.
20  ("Dr. Levy").  Based on information and belief, GLAHS pays part of a UCLA resident's salary
21  during his/her rotation and work at GLAHS, thereby making the resident an employee of GLAHS.
22  DR. HEAD's immediate supervisor at UCLA was Gerald Berke, M.D. ("Dr. Berke"), Chairman of
23  the UCLA Department of Head and Neck Surgery, who has tremendous power and influence at
24  GLAHS.

25        12.    Despite DR. HEAD's many accomplishments and contributions to the medical
26  profession, Dr. Berke and Dr. Wang have made several inappropriate racial comments about black
27  people, including DR. HEAD.  In or around 2003, Dr. Wang made comments that DR. HEAD was

28

Plaintiff's Second Amended Complaint for Damages                              Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                     Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                      BOHM LAW GROUP

hired as a Visiting Professor because he was an "affirmative action hire" and "affirmative action project."  In or around 2003, Dr. Wang also publicly stated that DR. HEAD is inferior because he is black, that he would not pass the boards, and that he was unqualified.  In or around 2003, Dr. Wang stated that "cream rises to the top," that DR. HEAD "would not make it in academic medicine," and that DR. HEAD and "doctors like him" who are black, were the reason for failed hospitals like King Drew.

13.     On information and belief, in or around mid-2003, Dr. Berke stated that "we're about to have some color" in the department.  Dr. Berke also stated, "I guess we'll have our first Nigger" now.

14.     From 2003 to present, DR. HEAD has lived with Dr. Wang's threats and affirmative actions to destroy DR. HEAD's career, reputation, and ability to earn a living.  In that regard, in 2003, Dr. Wang, who had supervisory authority over DR. HEAD at GLAHS and prepared evaluations of his performance, clearly indicated it was her intention to prevent DR. HEAD from receiving promotions, full time equivalents, tenure, and advancement.  Dr. Wang's discriminatory conduct has been continuous and consistent throughout DR. HEAD's employment.

15.     Starting in or around 2003, Dr. Wang began stating to other surgeons that she fully intended to interfere with DR. HEAD's professional advancement, in part by giving DR. HEAD subpar evaluations and falsely attacking DR. HEAD's credentials and performance at GLAHS.

16.     Sometime in or around 2004, DR. HEAD filed his initial EEO complaint.

17.     In or around June 2004, Dr. Wang was ordered by UCLA officials to stop submitting negative evaluations about DR. HEAD after Dr. Wang was reported by DR. HEAD as having called DR. HEAD an "affirmative action hire," amongst other racist comments.  At that time, Dr. Wang promised not to interfere with DR. HEAD's career advancement.  However, in direct violation of this order, Dr. Wang continued to submit negative supervisor evaluations at GLAHS regarding DR. HEAD's performance, which evidenced her obvious racial bias against DR. HEAD.  Dr. Wang's ongoing harassment and retaliation against DR. HEAD in this way continued to negatively impact DR. HEAD's career advancements.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

18.     In or around November 2005, Dr. Wang gave DR. HEAD a retaliatory and harassing evaluation of his teaching and performance at GLAHS in an attempt to interfere with his advancement at UCLA.  Dr. Wang rated DR. HEAD a 1 out of a possible 4 points in his review. Dr. Wang further wrote that DR. HEAD "doesn't teach, yells at junior residents," "poor availability, doesn't respond to messages," and "poor example & role model for residents."  Dr. Wang's performance review was in sharp contrast to reviews and comments made by other colleagues.

19.     On or about February 2, 2006, DR. HEAD sent a letter to Dr. Rosina Becerra ("Dr. Becerra"), then-Vice Provost for Faculty Diversity and Development at UCLA, regarding this harassment, discrimination, and related problems at UCLA and requested financial and other support to stop the harassment, retaliation, and interference with his career advancement.  DR. HEAD also requested that he be assigned more time working at UCLA in order to be removed from Dr. Wang's supervision at GLAHS.  In response, Dr. Becerra told DR. HEAD that she could not help him, and warned DR. HEAD it was not a good idea to participate in an investigation against Dr. Wang, implying that DR. HEAD will face retaliation if he honestly testifies.

20.     In or around April 2006, DR. HEAD was contacted for the first time by Investigator Nancy Solomon ("Investigator Solomon") of the Office of Inspector General ("OIG") regarding an investigation of Dr. Wang for time card fraud concerning work Dr. Wang performed at GLAHS. DR. HEAD learned from Investigator Solomon that Dr. Wang was under investigation by the federal government for submitting and/or approving false time cards pertaining to services provided at GLAHS.  DR. HEAD was asked by Investigator Solomon to testify about Dr. Wang's involvement in time card fraud.  DR. HEAD requested protection from Investigator Solomon, stating that he feared retaliation for his participation in the investigation.  With a promise by Investigator Solomon regarding protection from retaliation for his cooperation, DR. HEAD testified in an OIG deposition regarding Dr. Wang's time card issues.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

21.     In or around April/May 2006, UCLA and GLAHS Residents Dr. Lee, Dr. Crane, and others were called to testify in the time card case regarding Dr. Wang as well.  Those residents reported to Dr. Wang information concerning the investigation.

22.     The OIG investigation concluded that Dr. Wang had in fact committed time card fraud.  There was a recommendation by the OIG that Dr. Wang be removed from her leadership position and terminated from GLAHS; however, Dr. Wang's immediate supervisor, Dr. Berke, took steps to save Dr. Wang's job and leadership position—UCLA transferred vacation hours to Dr. Wang's account and research funds were transferred from Dr. Berke.  Additionally, Dr. Berke approached DR. NORMAN to request that Dr. Wang not be terminated.  Due to Dr. Berke's intervention and powerful influence, DR. NORMAN did not terminate Dr. Wang, did not dock her pay, and did not remove her from her leadership position as Chief of Head and Neck Surgery at GLAHS, despite the recommendation for termination by the OIG.  In fact, the only action taken was a written warning issued to Dr. Wang and termination of a subordinate.  (A true and correct copy of sworn deposition testimony of Dr. Wang regarding this issue is attached hereto as Exhibit A.  A true and correct copy of sworn deposition testimony of DR. NORMAN regarding this issue is attached hereto as Exhibit B.)

23.     Prior to DR. HEAD's participation in the time card fraud investigation of Dr. Wang, DR. HEAD had been nominated for Head and Neck Department teacher of the year; however, after providing truthful testimony in the OIG investigation regarding timecard fraud by Dr. Wang, DR. HEAD did not received the award.

24.     DR. HEAD's participation and truthful testimony in connection with Dr. Wang's time card fraud investigation in April 2006, further incited Dr. Berke and Dr. Wang to continue their campaign of intimidation, harassment, discrimination, and retaliation against DR. HEAD.

25.     In or around April/May 2006, DR. HEAD met with Dr. Berke to discuss DR. HEAD's total compensation package for the academic year 2006-2007.  Dr. Berke threatened DR. HEAD stating, "If you complain about Dr. Wang," and about not getting the compensation enhancement (a Full-Time Equivalent ("FTE") that was available, which Dr. Wang denied DR.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

HEAD and gave to another surgeon from outside the hospital), "you won't get anything, you'll be removed."

26.     In or around April/May 2006, shortly after DR. HEAD provided deposition testimony to the OIG, Dr. Wang discussed with the residents of the UCLA Head and Neck Department, whom she supervised and worked with, including Dr. Lee and Dr. Crane, about DR. HEAD's participation in the time card fraud investigation.  In addition, Dr. Wang spoke with many of the residents who worked under her supervision as they each testified in the time card fraud investigation.  As a result, these residents, including Dr. Lee and Dr. Crane, began to participate in the intimidation, harassment, discrimination, and retaliation of DR. HEAD.  DR. HEAD began to experience horribly offensive discriminatory comments, graphic racial photos, and retaliatory actions and statements.

27.     In or around May 2006, DR. HEAD reported to Dr. Dennis Slamon ("Dr. Slamon") that he was being harassed and retaliated against by Dr. Berke and Dr. Wang and was worried about his future.  Dr. Slamon responded, "They [Dr. Berke, Dr. Wang, and Dr. Abemayor] think you ratted out Wang in the IG investigation.  You need to keep your head down and stay out of this.  Don't complain."

28.     In or around May 2006, DR. HEAD requested a full-time appointment at GLAHS, but did not receive the appointment despite being more qualified than other choices.

29.     In or around June 2006, at the year-end closing ceremony and party for the UCLA Head and Neck Department—attended by approximately 200 people including UCLA and VA faculty, staff, chairs, residents, and spouses—the resident class presented a slide show.  The slide show, presented by the Residents, including Dr. Lee and Dr. Crane, had an entire section about DR. HEAD.  These slides, directed toward DR. HEAD, were exceptionally vulgar, disturbing, defamatory, discriminatory, retaliatory, humiliating, degrading, disgusting, demoralizing, and racist.  One slide, depicted a hairy, black gorilla with DR. HEAD's face superimposed on the gorilla, being sodomized by a white naked man with the head of Dr. Berke superimposed on the body (the "Gorilla Slide").  When this slide was shown, Dr. Wang and others in the crowd laughed

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

that DR. HEAD was "being screwed by his boss."  Another slide (referencing the OIG time card fraud investigation of Dr. Wang) showed DR. HEAD on the telephone and read: "If all else fails call 1-800-488-VA IG."  (See Exhibit C.)  The other slides throughout the presentation were similar to Dr. Wang's comments in her performance "evaluations" of DR. HEAD: that he is a bad doctor, bad researcher, and bad teacher.  (In the years past and since, Dr. Berke has reviewed each resident class' year-end slide show and vetoed slides with inappropriate jokes directed at homosexuals and/or women or slides with offensive content.  In fact, based on information and belief, this slide show, including the Gorilla Slide, was reviewed by Dr. Berke and others who worked at UCLA, who did nothing to stop the presentation.)  These slides were created and published by physicians who worked at GLAHS.  (A true and correct copy of sworn deposition testimony of Dr. Wang regarding this issue is attached hereto as Exhibit D.  A true and correct copy of sworn deposition testimony of DR. NORMAN regarding this issue is attached hereto as Exhibit E.)

30.    In or around June 2006, DR. HEAD's surgical practice was restricted, and more complex surgical operating room time was being given to vastly under qualified surgeons.

31.    In or around December 2006, Dr. Wang continued to submit false critical evaluations of DR. HEAD, assigning him the lowest marks possible.  Caused by her malice, personal vendetta, and discriminatory bias towards DR. HEAD, Dr. Wang's false evaluations were defaming to DR. HEAD's professional reputation, criticizing his competence generally and as a teacher, researcher, and mentor.

32.    In or around December 2007, Dr. Wang submitted another critical evaluation of DR. HEAD giving him all 1's out of 5's.  Dr. Wang made false states such as: "Difficult to reach on pager."  "No tangible research activity."  "Poor role model."

33.    In or around early 2007, DR. HEAD learned that Dr. Berke and Dr. Wang were planning on terminating DR. HEAD's employment if given the opportunity.  Consistent with the repeatedly expressed intention to remove DR. HEAD, Dr. Berke and Dr. Wang micromanaged DR. HEAD's performance, concerning trivial matters or matters that were entirely manufactured.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

Although DR. HEAD actively and successfully thwarted Dr. Berke's and Dr. Wang's efforts to vex, annoy, and harass him into voluntarily resigning his position, Dr. Wang continued to provide negative evaluations of DR. HEAD between 2007 and 2008.

34.    On or about, May 5, 2008, Dr. Wang again submitted a Teaching Evaluation— knowing it was to be submitted into DR. HEAD's Promotions Packet for tenure decisions— marking all 1's (Unsatisfactory), stating "poor clinical judgment, poor availability, poor role model."   (See Exhibit F.)   Dr. Wang continued to provide negative false information and evaluations about DR. HEAD, despite orders to stop.

35.    In or around July 2008, in a further attempt to harass and retaliated against DR. HEAD, he was wrongfully accused of ten counts of timecard fraud and lying to his supervisor.

36.    In or around August 2008, DR. HEAD's salary was reduced.  At this time, in order to undermine DR. HEAD's teaching, a fee-based physician was hired in the clinic to see DR. HEAD's patients at an increased cost to GLAHS.

37.    In or around August 2008, DR. HEAD was transferred to the QA program to minimize the retaliation by management resulting from his 2004 EEO complaint.

38.    On or about September 10, 2008, the Chief of Organization Improvement at the Department of Veterans Affairs wrote a detailed account of the harassment, discrimination, and retaliation against DR. HEAD.   In this letter, DR. HEAD was exonerated of timecard fraud. Furthermore, it was found that "Dr. Stelzner and Dr. Wang improperly treated Dr. Head differently than other members of the section."  (See Exhibit G.)

39.    In early 2009, DR. HEAD again consulted with Dr. Becerra regarding Dr. Wang's unfair and improper evaluations of DR. HEAD and her treatment of DR. HEAD in assignments and research opportunities.  Dr. Becerra responded, "Oh my God, here we go again.  I am going to legal with this."   Dr. Becerra replied, "Come back to see me if you don't get tenure, otherwise you're not damaged."

40.    In or around January 2009, in an attempt to further sabotage DR. HEAD's tenure and career advancement, Dr. Wang again submitted false evaluations of DR. HEAD.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

41.     On several occasions, regarding Dr. Wang's unfair treatment and improper evaluations of DR. HEAD's performance, DR. HEAD individually met with Dr. Gold, Dr. Rosenthal, Dr. Mechoso, and Dr. Becerra, all of whom communicated a similar message that if DR. HEAD wanted tenure, he better not take any action against Dr. Wang.

42.     In or around January 2009, DR. HEAD presented to Dr. Richard H. Gold ("Dr. Gold"), Assistant Dean of Academic Affairs a report conducted at GLAHS showing findings that Dr. Wang was biased against DR. HEAD in her evaluations of his performance, assignments, and research.  When DR. HEAD first received this report, DR. HEAD informed Dr. Berke that he had this report and could prove that Dr. Wang was treating him differently and unfairly in assignments and research opportunities.  Dr. Berke offered to pay DR. HEAD for the report saying, "How much do you want for the report?  You can't release that report."  DR. HEAD replied he did not want money, he wanted to be treated fairly and to receive the tenure he deserved and had earned.

43.     In or around June 2009, at the year-end Resident graduation, DR. HEAD observed Dr. Berke caressing and exchanging an open-mouthed, prolonged kiss with Dr. Wang.  Several days later, when DR. HEAD confronted Dr. Berke about this, Dr. Berke acknowledged the conduct, but Dr. Berke stated that he was drunk at the event.   DR. HEAD reported this inappropriate relationship to UCLA leadership.  Additionally, numerous other UCLA physicians and staff observed and discussed the romantic relationship between Dr. Wang and Dr. Berke, including a witness at GLAHS where Dr. Wang would discuss her relationship with Dr. Berke with colleagues and staff.  Based on DR. HEAD's report of this inappropriate sexual relationship between Dr. Berke and Dr. Wang, DR. HEAD began to endure further harassment and retaliation.

44.     In or around October 2009, a GLAHS employee reported the affair between Dr. Berke and Dr. Wang to DR. HEAD.  The GLAHS employee said he had known for a year, but feared retaliation and termination at the GLAHS.

45.     Also around this time, another GLAHS employee reported being transferred to another department and refused promotion for not submitting false report against DR. HEAD concerning his attendance at GLAHS.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

46.     Also around this time, prior to DR. NORMAN's vacation to Fiji, DR. HEAD and DR. NORMAN met to discuss DR. HEAD's fear of more intense retaliation and loss of income at GLAHS.   DR. NORMAN stated that DR. HEAD would be protected with a significant salary increase; however, that increase never occurred, instead, DR. HEAD endured further retaliation. On information and belief, DR. NORMAN later told a faculty member on his trip to Figi that "he really liked Dr. Marilene Wang and that they had a good relationship."

47.     In or around September through November 2010, DR. HEAD participated as a witness, and later in March through October 2011, DR. HEAD testified on behalf of Dr. Jasmine Bowers in a racial discrimination case ("Bowers Case") against an affiliated hospital where Dr. Wang is on the peer-review panel and considered a witness in the Bowers Case.   Immediately after DR. HEAD participated in the Bowers Case, UCLA, Dr. Berke, and Dr. Wang escalated the retaliation and harassment toward DR. HEAD.

48.     In or around June 2011, in an effort to further discredit DR. HEAD, Dr. Wang began making accusations of wrongdoing against DR. HEAD.   Dr. Wang stated to a group of surgeons that Dr. Wang was sure DR. HEAD would not last long and that he would be investigated at GLAHS where Dr. Wang is Chief of Head and Neck Surgery.

49.     On or about September 21, 2011, DR. NORMAN told DR. HEAD that "you're a bad doctor" and wrongfully accused DR. HEAD claiming "you're never here."

50.     On or about September 28, 2011, DR. NORMAN asked DR. HEAD in a very adversarial and confrontational tone about DR. HEAD's work hours.

51.     On or about October 6, 2011, DR. NORMAN threatened DR. HEAD stating "I'm very worried about you."

52.     On or about October 7, 2011, DR. HEAD filed his EEO complaint for discrimination and a hostile work environment based on reprisal for prior EEO activity based on the following events:

      a)   On August 2008, complainant was reassigned to the Quality Assurance (QA) Program.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

b) On July 2010, complainant's work schedule was changed.

c) On July 2010, complainant's request to work from home and/or to continue doing so was denied.

d) On July 2011, complainant became aware that during a "roast" held in 2006, slides of an "obscene" nature and photographs that portrayed complainant in an unflattering way were show.

e) On July 14, 2011, complainant's QA duties were reduced; other administrative duties were added, and complainant's title was changed.

f) On August 26, 2011, complainant heard rumors that management was planning to "do something" to him.

g) On September 21, 2011, D.N., Chief of Staff, said "You're a bad doctor" and "You're never here."

h) On September 28, 2011, D.N. was "very adversarial" when asking about complainant's work hours.

i) On October 6, 2011, D.N. said, "I'm very worried about you"; which the complainant took as a threat.

j) On October 25, 2011, complainant was charged with being Absent Without Leave (AWOL) which resulted in a $7,000.00 reduction in pay.

53. As outlined in Plaintiff's EEO complaint, it was not until 2011 when DR. HEAD realized Dr. Wang's role in the offensive slide show and how the slide show related to DR. HEAD's role as a witness in the investigation regarding Dr. Wang's timecard fraud. DR. HEAD realized that Dr. Wang initiated the retaliatory conduct against him (i.e. the offensive slide show by Dr. Crane and Dr. Lee) specifically for retribution for DR. HEAD's role as a witness in the OIG investigation into timecard fraud by Dr. Wang. In 2011, DR. HEAD realized that Dr. Wang, in her role as a federal employee with the VA, was actually responsible for the discriminatory and retaliatory conduct. Furthermore, while DR. HEAD was present during the 2006 slide show, he did not remember seeing the "If all else fails call 1-800-488-VAIG" ("VAIG Slide") slide because

13

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

of his shock and disgust over the "Gorilla Slide." It was not until 2011, after DR. HEAD received in discovery a print out of the slide show, that DR. HEAD reviewed the VAIG Slide and was able to connect Dr. Wang's role in the presentation of the slide show.

54.     In or around October 2011, James Itamura, EEO Investigator, wrote a detailed account of the harassment, discrimination, and retaliation occurring against DR. HEAD at GLAHS, which was provided to the Office of Special Counsel.  (See Exhibit H.)

55.     On or about October 25, 2011, DR. HEAD was on an emergency call at UCLA when he contacted Vishad Nabili, M.D. ("Dr. Nabili") to cover for him on an elective surgery at GLAHS.  A few days later, DR. HEAD learned that he was accused of not showing up for a surgical procedure, which was reported to Human Resources.  Despite his promise to correct DR. HEAD's timecards to correctly reflect DR. HEAD's work, DR. NORMAN, with cooperation from DIRECTOR BEITER, charged DR. HEAD with being Absent Without Leave ("AWOL") and reduced DR. HEAD's pay approximately $7,000.

56.     Around this time, DR. HEAD was being told by co-workers that DR. NORMAN, with cooperation from DIRECTOR BEITER, was trying to push DR. HEAD out of GLAHS.

57.     In or around November 2011, Dr. Joel Sercarz ("Dr. Sercarz"), fellow Head and Neck Surgeon at UCLA, informed DR. HEAD that Dr. Wang told Dr. Sercarz that GLAHS was planning to "get [DR. HEAD] on time card fraud."  DR. HEAD reported these allegations to DR. NORMAN and others.   In retaliation, DR. NORMAN, with cooperation from DIRECTOR BEITER, tried to restrict DR. HEAD's tour of duty.

58.     On or about November 20, 2011, DR. NORMAN ordered his assistant to mark DR. HEAD AWOL for 90% of the pay period.  This action resulted in severe financial distress for DR. HEAD, causing his house to go into foreclosure.  Despite DR. HEAD providing evidence showing he in fact did work his tour of duty, DR. NORMAN did not turn in DR. HEAD's timecards for several weeks.  It was not until after Congresswoman Karen Bass and others inquired into DR. HEAD's pay, that DR. HEAD finally received a check.

14

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

59.     In or around June/July 2012, Dr. Jeff Suh ("Dr. Suh"), fellow Head and Neck Surgeon at UCLA, told a representative of a sinus surgery supply company not to assist DR. HEAD with necessary surgical supplies or with his lawsuit or the representative would lose all business at UCLA.  Around this same time, Dr. Suh also threatened Dr. Sercarz not to assist DR. HEAD with his lawsuit or his complex surgical cases or he would not receive help or referred cases.  Dr. Suh claimed he was speaking on behalf of Dr. Wang in regards to these threats.

60.     On or about August 2, 2012, in further harassment and retaliation against DR. HEAD, Dr. Wang refused to treat one of DR. HEAD's patients, leaving the patient in the emergency room for days, using the patient's care and safety as a weapon against DR. HEAD, creating a hostile environment and jeopardizing patient safety.

61.     For several years, Dr. Wang has published disparaging and defamatory statements about DR. HEAD, falsely referring to him as a bad doctor, a bad researcher, and a bad mentor to residents and hospital staff.

62.     In or around May 2014, DR. HEAD learned that VA administrators—on information and belief, DIRECTOR BEITER and DR. NORMAN—had improperly taken approximately 60-100 days of sick leave time and approximately 80-90 days of vacation time from DR. HEAD in retaliation for DR. HEAD's protected activity, specifically, DR. HEAD's truthful testimony regarding Dr. Wang's illegal time card fraud and testimony in support of Dr. Bowers's racial discrimination case, which currently pending for trial in federal court.  These GLAHS administrators retroactively took these accrued time-off days, falsely claiming that DR. HEAD had previously failed to enter his time.

63.     On or about July 8, 2014, at the request of the United States Congress, DR. HEAD testified before the House Committee on Veterans' Affairs regarding "VA Whistleblowers: Exposing Inadequate Service Provided to Veterans and Ensuring Appropriate Accountability."  (A true and correct copy of DR. HEAD's full written testimony is attached hereto as Exhibit I.  For access to the DR. HEAD's oral testimony, please visit: http://www.c-span.org/video/?320316-1/hearing-whistleblowers-va.)

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

64.     During DR. HEAD's testimony before Congress, he outlined exactly the pattern for retaliation within the VA system: isolate, defame, and attack professional competence.  As the following facts will show, since DR. HEAD's testimony before Congress, his supervisors, DIRECTOR BEITER and DR. NORMAN, have done exactly this—they immediately attempted to defame his credibility, then they tried to revoke his operating room ("OR") privileges in an attempt to attack his professional competence, and now they are working to isolate DR. HEAD within the workplace.

65.     Since July 8, 2014, based on information and belief, DIRECTOR BEITER and DR. NORMAN are making untrue and disparaging comments to other VA staff members about DR. HEAD.  DR. NORMAN has claimed that DR. HEAD is lying about Dr. Wang's timecard fraud, despite Dr. Wang and DR. NORMAN previously testifying under oath that Dr. Wang was found to have committed timecard fraud and that the OIG recommended that Dr. Wang be terminated.  (See Exhibits A and B.)

66.     In or around late-July 2014, DR. HEAD's patients started being taken away and reassigned to Dr. Wang.

67.     In or around late-July 2014, DR. NORMAN stated to DR. HEAD that "Dr. Wang is not going anywhere," and "If you don't like it, you're a whistleblower, take it to Congress."

68.     On or about August 15, 2014, DR. HEAD was prevented from entering the main operating room by the OR Nurse Director.   The OR Nurse Director made a loud statement, "Dr. Head you have no surgical privileges, you cannot enter the operating room."  DR. HEAD asked her to call hospital privileging.  The OR Nurse Director asked for the "white book" and next to DR. HEAD's name in bold print was, "NO OR PRIVILEGES" with expiration in 5/2016.  This event was witnessed by numerous hospital staff, nurses, and surgeons.  The OR Nurse Director called hospital privileging who confirmed that DR. HEAD had full surgical privileges.  The event was meant to humiliate and retaliate against DR. HEAD and to further defame his good name and professional reputation.  There were others on the list in the "white book" with expired credentials,

16

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.                                    Lawrance A. Bohm, Esq.
                                                           Bradley J. Mancuso, Esq.
                                                           BOHM LAW GROUP

but no bold print "NO OR PRIVALEGES" next to their name.  This event could have also jeopardized patient care as there was a patient in the operating room waiting for surgery.

69.     In or around Mid-August 2014, DR. HEAD was notified that he would no longer be reporting to DR. DEAN NORMAN, but instead to Dr. Norman Ge.  DR. HEAD was troubled by this information considering that Dr. Ge is extremely good friends with DR. DEAN NORMAN, and DR. HEAD felt that this reassignment would do nothing to decrease the retaliation.

70.     Finally, on or about August 22, 2014, DR. HEAD was informed that the VA, at the direction of DIRECTOR BEITER and DR. NORMAN, would be transferring DR. HEAD's office out of the Chief of Staff area, located in the nicely furnished/decorated 6th floor, into a tiny, dirty, poorly furnished closet-sized office on the 4th floor so that DR. HEAD "could be by himself and not have to interact with others."  The locks on the doors and computer passwords were changed so that DR. HEAD would no longer have access to his office or computer.

71.     On or about September 5, 2014 and September 24, 2014, DR. HEAD attending two depositions (interviews under penalty of perjury) conducted by federal investigator Clara Trapnell. During one of these depositions, Investigator Clara Trapnell informed DR. HEAD that the reason he was transferred and reassigned a new office, essentially demoting DR. HEAD, was "because of his lawsuit."

72.     DR. HEAD is concurrently filing a complaint with the Office of Special Counsel pursuant 5 U.S.C. § 2302(b)(8) & (b)(9).  DR. HEAD will seek leave to amend this complaint to add this claim once administrative exhaustion has been completed.

## FIRST COUNT

(Discrimination, 42 U.S.C. § 2000e-2)

73.     The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

74.     This claim is asserted against Defendant ROBERT McDONALD, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS only.

Plaintiff's Second Amended Complaint for Damages     Lawrance A. Bohm, Esq.
and Demand for Jury Trial                             Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                              BOHM LAW GROUP

75.     At all times relevant to this matter, Title VII, 42 U.S.C. § 2000e-2, was in full force and effect and binding on Defendant.  Title VII, 42 U.S.C. § 2000e-2(a) reads, "It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."

76.     Plaintiff is a member of a protected class: African American.

77.     As outlined in paragraphs 8 and 9, Plaintiff is highly qualified for his position as a Head and Neck Surgeon and Associate Director, Chief of Staff, Legal and Quality Assurance. Furthermore, other than Dr. Wang's discriminatory and retaliatory performance evaluations, all evidence establishes that Plaintiff was performing his job satisfactorily.

78.     Because of his race, Plaintiff was subjected to adverse employment actions by DIRECTOR BEITER, DR. NORMAN, and Dr. Wang, all in their roles as employees of the VA. These adverse employment actions include, but are not limited to: denial of a promotion to a full-time appointment at GLAHS (¶ 28), demotion by restricting Plaintiff's surgical practice (¶ 30), false negative performance evaluations by Dr. Wang (¶ 31, 32, 34, 40), Plaintiff was falsely accused of ten counts of timecard fraud and lying to his supervisor (¶ 35), Plaintiff's salary was reduced (¶ 36), Plaintiff was promised a significant salary increase by DR. NORMAN; however, that increase never occurred (¶ 46), Dr. Wang made false accusations of wrongdoing by Plaintiff, stating to a group of surgeons that Dr. Wang was sure Plaintiff would not last long and that he would be investigated at GLAHS (¶ 48), DR. NORMAN made disparaging remarks to Plaintiff that "you're a bad doctor" (¶ 49), DR. NORMAN made false accusations about Plaintiff's work hours claiming "you're never here" (¶ 49, 50), false accusation that Plaintiff did not show up for a surgical procedure, which was reported to Human Resources, and DR. NORMAN, with cooperation from DIRECTOR BEITER, charged Plaintiff with being Absent Without Leave ("AWOL") and reduced Plaintiff's pay approximately $7,000 (¶ 55), DR. NORMAN, with cooperation from DIRECTOR BEITER, tried to restrict Plaintiff's tour of duty (¶ 57), DR.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

NORMAN ordered his assistant to mark Plaintiff AWOL for 90% of the pay period, resulting in severe financial distress for Plaintiff, causing his house to go into foreclosure (¶ 58), Dr. Wang refused to treat one of Plaintiff's patients, leaving the patient in the emergency room for days and using the patient's care and safety as a weapon against Plaintiff (¶ 60), Dr. Wang has published disparaging and defamatory statements about Plaintiff, falsely referring to him as a bad doctor, a bad researcher, and a bad mentor to residents and hospital staff (¶ 61), DIRECTOR BEITER and DR. NORMAN improperly took approximately 60-100 days of sick leave time (¶ 62), DIRECTOR BEITER and DR. NORMAN improperly took approximately 80-90 days of vacation time from Plaintiff (¶ 62), DIRECTOR BEITER and DR. NORMAN have made untrue and disparaging comments to other VA staff members about Plaintiff claiming that Plaintiff is lying (¶ 65), Plaintiff's patients have been taken away and reassigned to Dr. Wang (¶ 66),  and DIRECTOR BEITER and DR. NORMAN attempted to humiliate and retaliate against Plaintiff in a further attempt to defame his good name and professional reputation (¶ 68).

79.    Similarly situated individuals outside Plaintiff's protected class were treated more favorably.   For example: another doctor (non-African American) received the full-time appointment despite the fact Plaintiff was more qualified (¶ 28), more complex surgical operating room time was being given to vastly under qualified surgeons (non-African Americans) (¶ 30), a fee-based physician (non-African American) was hired in the clinic to see Plaintiff's patients at an increased cost to GLAHS (¶ 36), it was found that "Dr. Stelzner and Dr. Wang improperly treated Dr. Head differently than other members of the section" (¶ 38), non-African American doctors do not have to endure false and defamatory comments about their professional abilities, non-African American doctors do not have to endure false accusations, non-African American doctors do not have sick time and vacation time taken away from them for no reason, non-African American doctors do not have money deducted from their paychecks for no reason, non-African American doctors do not have their tours of duty restricted for no reason, non-African American doctor's patients are not being ignored, non-African American doctors are not receiving unwarranted and false performance evaluations, non-African American doctors do not have their surgical practices

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

restricted for no reason, non-African American doctors do not have their salaries reduced for no reason, non-African American doctors are not having to endure attempts to humiliate and retaliate against them in order to defame their good names and professional reputations.

80. All of these discriminatory acts were perpetrated by VA employees DIRECTOR BEITER and DR. NORMAN, and by Dr. Wang solely in her role as a VA employee.

81. A culture of racial discrimination exists at GLAHS. All of these adverse employment actions were caused by a racial animus towards Plaintiff. Plaintiff was subjected to unwanted discrimination and treated differently because he is African American. This discrimination was conducted by Defendants who created an environment that, among other things, tolerated and encouraged discrimination based on race thereby materially and negatively impacting the terms and conditions of Plaintiff's employment. The statements and conduct on the part of Defendants complained of herein represent a violation of Title VII, 42 U.S.C. § 2000e-2.

82. As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

<u>**SECOND COUNT**</u>

(Retaliation, 42 U.S.C. § 2000e)

83. The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

84. This claim is asserted against Defendant ROBERT McDONALD, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS only.

85. At all times relevant to this matter, Title VII, 42 U.S.C. § 2000e, was in full force and effect and binding on Defendant. Title VII, 42 U.S.C. § 2000e-3(a) reads, "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

20

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

86.     Plaintiff engaged in protected activity when he made complaints that he was being treated differently based on his race.  These protected activities include, but are not limited to:

87.     Plaintiff initially complained about racial discrimination and harassment sometime in or around 2004 when Plaintiff filed his initial EEO complaint (¶ 16).  From then on, Plaintiff endured a steady and continuing barrage of retaliation for this complaint.

88.     On or about February 2, 2006, Plaintiff sent a letter to Dr. Rosina Becerra ("Dr. Becerra"), then-Vice Provost for Faculty Diversity and Development at UCLA, regarding this harassment, discrimination, and related problems at UCLA and requested financial and other support to stop the harassment, retaliation, and interference with his career advancement.  Plaintiff also requested that he be assigned more time working at UCLA in order to be removed from Dr. Wang's supervision at GLAHS, but this request was denied.  Dr. Wang knew of this letter to Dr. Becerra and escalated her retaliation at the VA against Plaintiff (¶ 19).

89.     In or around April/May 2006, Plaintiff met with Dr. Berke at UCLA to discuss Plaintiff's total compensation package and Dr. Wang's mistreatment of Plaintiff.   Dr. Berke threatened DR. HEAD stating, "If you complain about Dr. Wang," and about not getting the compensation enhancement (a Full-Time Equivalent ("FTE") that was available, which Dr. Wang denied DR. HEAD and gave to another surgeon from outside the hospital), "you won't get anything, you'll be removed."  Dr. Wang knew of this meeting and again escalated her retaliation at the VA against Plaintiff (¶ 25).

90.     In or around May 2006, Plaintiff reported to Dr. Dennis Slamon ("Dr. Slamon") that he was being harassed and retaliated against by Dr. Berke and Dr. Wang and was worried about his future.  Dr. Slamon responded, "They [Dr. Berke, Dr. Wang, and Dr. Abemayor] think you ratted out Wang in the IG investigation.  You need to keep your head down and stay out of this.  Don't complain."  Dr. Wang knew of this complaint and again furthered her retaliation at the VA against Plaintiff (¶ 27).

91.     Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: denial of a promotion to a full-time appointment at GLAHS (¶ 28),

21

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

demotion by restricting Plaintiff's surgical practice (¶ 30), false negative performance evaluations by Dr. Wang (¶ 31, 32, 34, 40), Plaintiff was falsely accused of ten counts of timecard fraud and lying to his supervisor (¶ 35), Plaintiff's salary was reduced (¶ 36).

92.    In early 2009, Plaintiff again consulted with Dr. Becerra regarding Dr. Wang's unfair and improper evaluations of Plaintiff and her treatment of Plaintiff in assignments and research opportunities.  Dr. Wang knew of this complaint and again increased her retaliation at the VA against Plaintiff (¶ 39).

93.    On several occasions in or around 2009, regarding Dr. Wang's unfair treatment and improper evaluations of Plaintiff's performance, Plaintiff individually met with UCLA administration Dr. Gold, Dr. Rosenthal, Dr. Mechoso, and Dr. Becerra, all of whom communicated a similar message that if Plaintiff wanted tenure, he better not take any action against Dr. Wang. Dr. Wang knew of these complaint by Plaintiff and again escalated her retaliation at the VA against Plaintiff (¶ 41).

94.    In or around January 2009, Plaintiff presented to Dr. Richard H. Gold ("Dr. Gold"), Assistant Dean of Academic Affairs at UCLA a report conducted at GLAHS showing findings that Dr. Wang was biased against Plaintiff in her evaluations of his performance, assignments, and research.  Dr. Wang knew of this complaint by Plaintiff and increased her retaliation at the VA against Plaintiff (¶ 42).

95.    In or around June 2009, Plaintiff complained to Dr. Berke at UCLA about his improper sexual relationship with Dr. Wang.  Dr. Wang knew of this complaint by Plaintiff and furthered her retaliation at the VA against Plaintiff (¶ 43).

96.    In or around late-2009, Plaintiff and DR. NORMAN met to discuss Plaintiff's fear of more intense retaliation and loss of income at GLAHS.  On information and belief, DR. NORMAN later told a faculty member on his trip to Figi that "he really liked Dr. Marilene Wang and that they had a good relationship."  Dr. Wang knew of this complaint by Plaintiff and again increased her retaliation at the VA against Plaintiff (¶ 46).

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

97. Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: Plaintiff was promised a significant salary increase by DR. NORMAN; however, that increase never occurred (¶ 46), Dr. Wang made false accusations of wrongdoing by Plaintiff, stating to a group of surgeons that Dr. Wang was sure Plaintiff would not last long and that he would be investigated at GLAHS (¶ 48), DR. NORMAN made disparaging remarks to Plaintiff that "you're a bad doctor" (¶ 49), DR. NORMAN made false accusations about Plaintiff's work hours claiming "you're never here" (¶ 49, 50).

98. On or about October 7, 2011, Plaintiff again filed a complaint for racial discrimination and a hostile work environment based on reprisal for prior EEO activity based on the following events (¶ 52). Plaintiff again endured an escalated and continuing onslaught of retaliation at the VA for this complaint.

99. In or around October 2011, James Itamura, EEO Investigator, wrote a detailed account of the harassment, discrimination, and retaliation occurring against Plaintiff at GLAHS, which was provided to the Office of Special Counsel. Dr. Wang knew of this report and Plaintiff's role in it and continued her retaliation at the VA against Plaintiff (¶ 54).

100. Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: false accusation that Plaintiff did not show up for a surgical procedure, which was reported to Human Resources, and DR. NORMAN, with cooperation from DIRECTOR BEITER, charged Plaintiff with being Absent Without Leave ("AWOL") and reduced Plaintiff's pay approximately $7,000 (¶ 55).

101. In or around November 2011, Plaintiff was informed that Dr. Wang told Dr. Sercarz that GLAHS was planning to "get [DR. HEAD] on time card fraud." Plaintiff reported these allegations to DR. NORMAN and others. In retaliation, DR. NORMAN, with cooperation from DIRECTOR BEITER, tried to restrict Plaintiff's tour of duty, thereby retaliating against Plaintiff for this complaint (¶ 57).

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

102.    Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: DR. NORMAN, with cooperation from DIRECTOR BEITER, tried to restrict Plaintiff's tour of duty (¶ 57).

103.    On or about November 20, 2011, DR. NORMAN ordered his assistant to mark Plaintiff AWOL for 90% of the pay period.  This action resulted in severe financial distress for Plaintiff, causing his house to go into foreclosure.  Despite Plaintiff providing evidence showing he in fact did work his tour of duty, DR. NORMAN did not turn in Plaintiff's timecards for several weeks.  It was not until after Congresswoman Karen Bass and others inquired into Plaintiff's pay, that Plaintiff finally received a check.  DR. NORMAN added to the retaliation at the VA against Plaintiff because of this complaint (¶ 58).

104.    Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: DR. NORMAN ordered his assistant to mark Plaintiff AWOL for 90% of the pay period, resulting in severe financial distress for Plaintiff, causing his house to go into foreclosure (¶ 58), Dr. Wang refused to treat one of Plaintiff's patients, leaving the patient in the emergency room for days and using the patient's care and safety as a weapon against Plaintiff (¶ 60), Dr. Wang has published disparaging and defamatory statements about Plaintiff, falsely referring to him as a bad doctor, a bad researcher, and a bad mentor to residents and hospital staff (¶ 61), DIRECTOR BEITER and DR. NORMAN improperly took approximately 60-100 days of sick leave time (¶ 62), DIRECTOR BEITER and DR. NORMAN improperly took approximately 80-90 days of vacation time from Plaintiff (¶ 62).

105.    Plaintiff's ultimate act of complaining came on or about July 8, 2014, when, at the request of the United States Congress, Plaintiff testified before the House Committee on Veterans' Affairs regarding "VA Whistleblowers: Exposing Inadequate Service Provided to Veterans and Ensuring Appropriate Accountability."   DIRECTOR BEITER, DR. NORMAN, and Dr. Wang have greatly increased their retaliation at the VA against Plaintiff for the complaints Plaintiff testified about before Congress (¶ 63).

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

106.    Based on these complaints, Plaintiff endured the following adverse actions, including, but not limited to: DIRECTOR BEITER and DR. NORMAN have made untrue and disparaging comments to other VA staff members about Plaintiff claiming that Plaintiff is lying (¶ 65), Plaintiff's patients have been taken away and reassigned to Dr. Wang (¶ 66),  and DIRECTOR BEITER and DR. NORMAN attempted to humiliate and retaliate against Plaintiff in a further attempt to defame his good name and professional reputation (¶ 68).

107.    All of these retaliatory acts were perpetrated by VA employees DIRECTOR BEITER and DR. NORMAN, and by Dr. Wang solely in her role as a VA employee.

108.    Plaintiff's adverse actions are clearly causal connected to his protected activities. Plaintiff has made numerous protected complaints and has immediately and continuously suffered retaliatory adverse actions for those complaints.

109.    Plaintiff provided several notices to Defendant of practices illegal under Title VII, 42 U.S.C. § 2000e, such as harassment and discrimination based on race.    Accordingly, Defendant's retaliatory conduct violated Title VII, 42 U.S.C. § 2000e.

110.    As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

## THIRD COUNT

(Hostile Work Environment, 42 U.S.C. § 2000e-2)

111.    The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

112.    This claim is asserted against Defendant ROBERT McDONALD, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS only.

113.    At all times relevant to this matter, Title VII, 42 U.S.C. § 2000e-2, was in full force and effect and binding on Defendant.  Title VII, 42 U.S.C. § 2000e-2(a) reads, "It shall be an unlawful employment practice for an employer to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

1  employment opportunities or otherwise adversely affect his status as an employee, because of such

2  individual's race, color, religion, sex, or national origin."

3      114.   Because of his race, Plaintiff has been subjected to harassing verbal conduct and

4  harassing actions by VA employees DIRECTOR BEITER and DR. NORMAN, and by Dr. Wang

5  solely in her role as a VA employee, dating back to 2002.  The following list of harassing conduct

6  stems entirely from these individuals' racial animosity towards Plaintiff.  This harassing conduct

7  includes, but is not limited to:

8      115.   Dr. Wang making several inappropriate racial comments about black people,

9  including Plaintiff, such as, Plaintiff was hired as a Visiting Professor because he was an

10  "affirmative action hire" and "affirmative action project," Plaintiff is inferior because he is black,

11  that Plaintiff would not pass the boards, that Plaintiff was unqualified, Dr. Wang stated that "cream

12  rises to the top," that Plaintiff "would not make it in academic medicine," and that Plaintiff and

13  "doctors like him" who are black were the reason for failed hospitals like King Drew (¶ 12),

14  Plaintiff has continually lived with Dr. Wang's threats and actions to destroy Plaintiff's career,

15  reputation, and ability to earn a living because of Plaintiff's race, indicating that it was her

16  intention to prevent Plaintiff from receiving promotions, full time equivalents, tenure, and

17  advancement (¶ 14), Dr. Wang has stated to other surgeons her intention to interfere with

18  Plaintiff's professional advancement, in part by giving Plaintiff subpar evaluations and falsely

19  attacking Plaintiff's credentials and performance at GLAHS (¶ 15), despite being ordered to stop

20  submitting negative evaluations about Plaintiff, Dr. Wang continued to submit negative supervisor

21  evaluations at GLAHS regarding Plaintiff's performance, which evidenced her obvious racial bias

22  against Plaintiff (¶ 17) Dr. Wang gave Plaintiff a retaliatory and harassing evaluation of his

23  teaching and performance at GLAHS in an attempt to interfere with his advancement at UCLA,

24  rating Plaintiff a 1 out of a possible 4 points in his review and writing that Plaintiff "doesn't teach,

25  yells at junior residents," "poor availability, doesn't respond to messages," and "poor example &

26  role model for residents" (¶ 18), DIRECTOR BEITER and DR. NORMAN has denied Plaintiff a

27  promotion to a full-time appointment at GLAHS (¶ 28), DIRETOR BEITER and DR. NORMAN

28

Plaintiff's Second Amended Complaint for Damages                                    Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                                        Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                                       BOHM LAW GROUP

1   has demoted Plaintiff by restricting Plaintiff's surgical practice (¶ 30), Dr. Wang has submitted

2   false negative performance evaluations (¶ 17, 18, 31, 32, 34, 40), Plaintiff learned that Dr. Wang

3   was planning on terminating Plaintiff's employment if given the opportunity and started

4   micromanaging Plaintiff's performance and continuing to provide negative evaluations of Plaintiff

5   (¶ 33) Plaintiff was falsely accused of ten counts of timecard fraud and lying to his supervisor (¶

6   35), Plaintiff's salary was reduced (¶ 36), Plaintiff was promised a significant salary increase by

7   DR. NORMAN; however, that increase never occurred (¶ 46), Dr. Wang made false accusations of

8   wrongdoing by Plaintiff, stating to a group of surgeons that Dr. Wang was sure Plaintiff would not

9   last long and that he would be investigated at GLAHS (¶ 48), DR. NORMAN made disparaging

10  remarks to Plaintiff that "you're a bad doctor" (¶ 49), DR. NORMAN made false accusations

11  about Plaintiff's work hours claiming "you're never here" (¶ 49, 50), false accusation that Plaintiff

12  did not show up for a surgical procedure, which was reported to Human Resources, and DR.

13  NORMAN, with cooperation from DIRECTOR BEITER, charged Plaintiff with being Absent

14  Without Leave ("AWOL") and reduced Plaintiff's pay approximately $7,000 (¶ 55), DR.

15  NORMAN, with cooperation from DIRECTOR BEITER, has been trying to push Plaintiff out of

16  GLAHS (¶ 56), DR. NORMAN, with cooperation from DIRECTOR BEITER, tried to restrict

17  Plaintiff's tour of duty (¶ 57), DR. NORMAN ordered his assistant to mark Plaintiff AWOL for

18  90% of the pay period, resulting in severe financial distress for Plaintiff, causing his house to go

19  into foreclosure (¶ 58), Dr. Wang refused to treat one of Plaintiff's patients, leaving the patient in

20  the emergency room for days and using the patient's care and safety as a weapon against Plaintiff

21  (¶ 60), Dr. Wang has published disparaging and defamatory statements about Plaintiff, falsely

22  referring to him as a bad doctor, a bad researcher, and a bad mentor to residents and hospital staff

23  (¶ 61), DIRECTOR BEITER and DR. NORMAN improperly took approximately 60-100 days of

24  sick leave time (¶ 62), DIRECTOR BEITER and DR. NORMAN improperly took approximately

25  80-90 days of vacation time from Plaintiff (¶ 62), DIRECTOR BEITER and DR. NORMAN have

26  made untrue and disparaging comments to other VA staff members about Plaintiff claiming that

27  Plaintiff is lying (¶ 65), Plaintiff's patients have been taken away and reassigned to Dr. Wang (¶

28

Plaintiff's Second Amended Complaint for Damages                                    Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                            Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                             BOHM LAW GROUP

66), and DIRECTOR BEITER and DR. NORMAN attempted to humiliate and retaliate against Plaintiff in a further attempt to defame his good name and professional reputation (¶ 68).

116.    These harassing verbal comments and harassing conduct directed toward Plaintiff because of his race have been clearly unwelcome by Plaintiff, as is evidenced by his numerous complaints, such as, but not limited to:

117.    Plaintiff initially complained about racial discrimination and harassment sometime in or around 2004 when Plaintiff filed his initial EEO complaint (¶ 16).  From then on, Plaintiff endured a steady and continuing barrage of retaliation for this complaint.  On or about February 2, 2006, Plaintiff sent a letter to Dr. Rosina Becerra ("Dr. Becerra"), then-Vice Provost for Faculty Diversity and Development at UCLA, regarding this harassment, discrimination, and related problems at UCLA and requested financial and other support to stop the harassment, retaliation, and interference with his career advancement.  Plaintiff also requested that he be assigned more time working at UCLA in order to be removed from Dr. Wang's supervision at GLAHS, but this request was denied.  Dr. Wang knew of this letter to Dr. Becerra and escalated her retaliation at the VA against Plaintiff (¶ 19).  In or around April/May 2006, Plaintiff met with Dr. Berke at UCLA to discuss Plaintiff's total compensation package and Dr. Wang's mistreatment of Plaintiff.  Dr. Berke threatened DR. HEAD stating, "If you complain about Dr. Wang," and about not getting the compensation enhancement (a Full-Time Equivalent ("FTE") that was available, which Dr. Wang denied DR. HEAD and gave to another surgeon from outside the hospital), "you won't get anything, you'll be removed."  Dr. Wang knew of this meeting and again escalated her retaliation at the VA against Plaintiff (¶ 25).  In or around May 2006, Plaintiff reported to Dr. Dennis Slamon ("Dr. Slamon") that he was being harassed and retaliated against by Dr. Berke and Dr. Wang and was worried about his future.  Dr. Slamon responded, "They [Dr. Berke, Dr. Wang, and Dr. Abemayor] think you ratted out Wang in the IG investigation.  You need to keep your head down and stay out of this.  Don't complain."  Dr. Wang knew of this complaint and again furthered her retaliation at the VA against Plaintiff (¶ 27).  In early 2009, Plaintiff again consulted with Dr. Becerra regarding Dr. Wang's unfair and improper evaluations of Plaintiff and her treatment of

28

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

1    Plaintiff in assignments and research opportunities.  Dr. Wang knew of this complaint and again

2    increased her retaliation at the VA against Plaintiff (¶ 39).  On several occasions in or around

3    2009, regarding Dr. Wang's unfair treatment and improper evaluations of Plaintiff's performance,

4    Plaintiff individually met with UCLA administration Dr. Gold, Dr. Rosenthal, Dr. Mechoso, and

5    Dr. Becerra, all of whom communicated a similar message that if Plaintiff wanted tenure, he better

6    not take any action against Dr. Wang.  Dr. Wang knew of these complaint by Plaintiff and again

7    escalated her retaliation at the VA against Plaintiff (¶ 41).  In or around January 2009, Plaintiff

8    presented to Dr. Richard H. Gold ("Dr. Gold"), Assistant Dean of Academic Affairs at UCLA a

9    report conducted at GLAHS showing findings that Dr. Wang was biased against Plaintiff in her

10   evaluations of his performance, assignments, and research.  Dr. Wang knew of this complaint by

11   Plaintiff and increased her retaliation at the VA against Plaintiff (¶ 42).  In or around June 2009,

12   Plaintiff complained to Dr. Berke at UCLA about his improper sexual relationship with Dr. Wang.

13   Dr. Wang knew of this complaint by Plaintiff and furthered her retaliation at the VA against

14   Plaintiff (¶ 43).  In or around late-2009, Plaintiff and DR. NORMAN met to discuss Plaintiff's fear

15   of more intense retaliation and loss of income at GLAHS.  On information and belief, DR.

16   NORMAN later told a faculty member on his trip to Figi that "he really liked Dr. Marilene Wang

17   and that they had a good relationship."  Dr. Wang knew of this complaint by Plaintiff and again

18   increased her retaliation at the VA against Plaintiff (¶ 46).  On or about October 7, 2011, Plaintiff

19   again filed a complaint for racial discrimination and a hostile work environment based on reprisal

20   for prior EEO activity based on the following events (¶ 52).  Plaintiff again endured an escalated

21   and continuing onslaught of retaliation at the VA for this complaint.  In or around October 2011,

22   James Itamura, EEO Investigator, wrote a detailed account of the harassment, discrimination, and

23   retaliation occurring against Plaintiff at GLAHS, which was provided to the Office of Special

24   Counsel.  Dr. Wang knew of this report and Plaintiff's role in it and continued her retaliation at the

25   VA against Plaintiff (¶ 54).  In or around November 2011, Plaintiff was informed that Dr. Wang

26   told Dr. Sercarz that GLAHS was planning to "get [DR. HEAD] on time card fraud."  Plaintiff

27   reported these allegations to DR. NORMAN and others.  In retaliation, DR. NORMAN, with

28

29

| Plaintiff's Second Amended Complaint for Damages | Lawrance A. Bohm, Esq. |
| and Demand for Jury Trial | Bradley J. Mancuso, Esq. |
| HEAD v. McDONALD, ET AL. | BOHM LAW GROUP |

cooperation from DIRECTOR BEITER, tried to restrict Plaintiff's tour of duty, thereby retaliating against Plaintiff for this complaint (¶ 57).   On or about November 20, 2011, DR. NORMAN ordered his assistant to mark Plaintiff AWOL for 90% of the pay period.   This action resulted in severe financial distress for Plaintiff, causing his house to go into foreclosure.   Despite Plaintiff providing evidence showing he in fact did work his tour of duty, DR. NORMAN did not turn in Plaintiff's timecards for several weeks.   It was not until after Congresswoman Karen Bass and others inquired into Plaintiff's pay, that Plaintiff finally received a check.   DR. NORMAN added to the retaliation at the VA against Plaintiff because of this complaint (¶ 58).   Plaintiff's ultimate act of complaining came on or about July 8, 2014, when, at the request of the United States Congress, Plaintiff testified before the House Committee on Veterans' Affairs regarding "VA Whistleblowers: Exposing Inadequate Service Provided to Veterans and Ensuring Appropriate Accountability."   DIRECTOR BEITER, DR. NORMAN, and Dr. Wang have greatly increased their retaliation at the VA against Plaintiff for the complaints Plaintiff testified about before Congress (¶ 63).

118.    These harassing verbal comments and harassing conduct directed toward Plaintiff because of his race have been both severe and pervasive.   The severity of these comments and actions is obvious, from negative comments about Plaintiff's ability as a surgeon, to demoting and failing to pay Plaintiff, to attempts to force Plaintiff out of GLAHS, all based solely on the color of his skin.   The pervasiveness of these harassing verbal comments and harassing conduct directed toward Plaintiff because of his race have been ongoing since 2002.   To this day, the primary perpetrators of this behavior—DIRECTOR BEITER, DR. NORMAN, and Dr. Wang—treat Plaintiff differently, on a daily basis, simply because of his race.   In fact, Plaintiff's daily endurance of this hostile work environment is taking a tremendous toll on Plaintiff's health, from severe stress and anxiety, to inability to sleep, to gastrointestinal issues.

119.    Plaintiff has been subjected to a hostile work environment because of his race.   These harassing verbal comments and harassing conduct directed toward Plaintiff because of his race was conducted by Defendant who created an environment that, among other things, tolerated

30

Plaintiff's Second Amended Complaint for Damages                                          Lawrance A. Bohm, Esq.
and Demand for Jury Trial                                                                              Bradley J. Mancuso, Esq.
HEAD v. McDONALD, ET AL.                                                                      BOHM LAW GROUP

and encouraged discrimination based on race, thereby materially and negatively impacting the terms and conditions of Plaintiff's employment.   The statements and conduct on the part of Defendants complained of herein represent a violation of Title VII, 42 U.S.C. § 2000e-2.

120.   As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

### FOURTH COUNT

(42 U.S.C. § 1985(2))

121.   The allegations set forth in this complaint are hereby re-alleged and incorporated by reference.

122.   This claim is asserted against Defendants DIRECTOR BEITER and DR. NORMAN only.

123.   Pursuant to 42 U.S.C. § 1985(2), "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."

124.   As outlined above, DIRECTOR BEITER and DR. NORMAN conspired to deter Plaintiff by force, intimidation, or threat from testifying freely in his pending lawsuit against the VA.

31

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

125.    This was done when, on or about August 22, 2014, DR. HEAD was informed that the VA, at the direction of DIRECTOR BEITER and DR. NORMAN, would be transferring DR. HEAD's office out of the Chief of Staff area, located in the nicely furnished/decorated 6th floor, into a tiny, dirty, poorly furnished closet-sized office on the 4th floor so that DR. HEAD "could be by himself and not have to interact with others."  The locks on the doors and computer passwords were changed so that DR. HEAD would no longer have access to his office or computer.  (¶ 70)

126.    Furthermore, on or about September 5, 2014 and September 24, 2014, DR. HEAD attending two depositions (interviews under penalty of perjury) conducted by federal investigator Clara Trapnell.  During one of these depositions, Investigator Clara Trapnell informed DR. HEAD that the reason he was transferred and reassigned a new office, essentially demoting DR. HEAD, was "because of his lawsuit."[1]  (¶ 71)

127.    Furthermore, these actions by DIRECTOR BEITER and DR. NORMAN have injured Plaintiff by causing him severe stress and anxiety, coupled with physical manifestations of this stress and anxiety, thereby hampering his ability to present an effective case.

128.    As an actual and proximate result of the aforementioned violations, Plaintiff has been harmed in an amount according to proof, but in an amount in excess of the jurisdiction of this Court.

129.    The above described actions were perpetrated and/or ratified by a managing agent or officer of Defendant.  These acts were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's rights.  Further, said actions were despicable in character and warrant the imposition of punitive damages in a sum sufficient to punish and deter Defendants' future conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant and any other defendants who may be later added to this action as follows:

///

---

[1] Additionally, DR. HEAD has been retaliated against for participating as a witness in: (1) the OIG investigation against Dr. Wang; (2) the civil lawsuit by Dr. Bowers; and (3) DR. HEAD's testimony before Congress.  This is important background information to establish a pattern of retaliation against DR. HEAD for participating as a party/witness in legal proceedings.

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP

1.     For compensatory damages, including, but not limited to lost wages, benefits, and non-economic damages in the amount according to proof;

2.     For attorneys' fees and costs pursuant to all applicable statutes or legal principles;

3.     For cost of suit incurred;

4.     For punitive damages or other penalties as recoverable by law;

5.     For prejudgment interest;

6.     For injunctive relief; and

7.     For such other and further relief as the court may deem proper.

Dated: October 31, 2014          By:   */s/ Bradley J. Mancuso*
                                        LAWRANCE A. BOHM, ESQ.
                                        BRADLEY J. MANCUSO, ESQ.

                                        Attorneys for Plaintiff
                                        CHRISTIAN HEAD, M.D.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for this matter.

Dated: October 31, 2014          By:   */s/ Bradley J. Mancuso*
                                        LAWRANCE A. BOHM, ESQ.
                                        BRADLEY J. MANCUSO, ESQ.

                                        Attorneys for Plaintiff
                                        CHRISTIAN HEAD, M.D.

33

Plaintiff's Second Amended Complaint for Damages
and Demand for Jury Trial
HEAD v. McDONALD, ET AL.

Lawrance A. Bohm, Esq.
Bradley J. Mancuso, Esq.
BOHM LAW GROUP