1
2
3
4
5
6
7

8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10   CHRISTIAN HEAD,                      Case No. 2:14-cv-01563-MCS-PLA

11                     Plaintiff,         **ORDER GRANTING MOTIONS FOR**
12                                        **SUMMARY JUDGMENT [176, 177]**

13            v.

14
15   DENIS R. McDONOUGH, Secretary,
     UNITED STATES DEPARTMENT
16   OF VETERANS AFFAIRS, et al.,

17                     Defendant.

18

19   **I.     INTRODUCTON AND RELEVANT PROCEDURAL BACKGROUND**

20            Plaintiff Dr. Christian Head, an African American head and neck surgeon, sues

21   the Department of Veterans Affairs ("VA") for **(1)** discrimination in violation of 42

22   U.S.C. § 2000e-2, **(2)** retaliation in violation of 42 U.S.C. § 2000e-3(a), and **(3)** hostile

23   work environment in violation of 42 U.S.C. § 2000e-2. Head sues VA employees Donna

24   M. Beiter and Dr. Dean Norman for conspiracy to deter a party witness under 42 U.S.C.

25   § 1985(2). Defendants moved for summary judgment on January 20, 2015, arguing that

26   **(1)** the discrimination claim was unexhausted, untimely, not attributable to the VA, and

27   did not constitute adverse employment action; **(2)** Head could not establish that his prior

28   activity caused an adverse employment action; **(3)** Head could not establish that he was

subjected to severe or pervasive, unwanted verbal or physical conduct of a racial nature by a VA employee; and **(4)** the conspiracy claim failed for lack of evidence of conspiracy to deter him by force, intimidation, and threat from attending court or testifying freely. *See* ECF No. 31. The Court granted in part and denied in part Defendants' summary judgment motion, finding in part that Head's argument that some of the allegedly untimely conduct should be actionable under the continuing violation doctrine could be addressed at an evidentiary hearing. *See* Order Granting in Part and Denying in Part Defs.' Mot. for Summ. J. ("MSJ Order 1"), ECF No. 73. The Court further ordered the parties "to address the issue of timeliness…and the issue of whether Head timely exhausted his claim that Norman and Beiter improperly took sick leave and vacation days from him." *Id.* Following a two-day evidentiary hearing, the Court granted summary judgment for Defendants on claims arising from certain allegations, denied summary judgment with respect to claims regarding Quality of Assurance ("QA") duties discussed below, and granted leave for Defendants to file motions for partial summary judgment concerning Head's "post-charge" retaliation claims. *See* Order Regarding Evid. Hr'g ("MSJ Order 2"), ECF No. 100. The Court then granted Defendants' partial summary judgment motion, finding in part that the post-charge claims could not be actionable as related claims to the equal employment opportunity ("EEO") charge. *See* Order Granting Mot. for Partial Summ. J. ("MSJ Order 3"), ECF No. 111. After the VA filed another summary judgment motion, the Court granted summary judgment on Head's retaliation claim because there was no causal connection between any relevant act and Head's protected activity. *See* Order Granting Mot. for Summ. J. ("MSJ Order 4"), ECF No. 127. The Court also granted summary judgment on Head's hostile work environment claim because the VA's conduct was not severe enough to alter the condition of Head's work environment. *Id.*

The Ninth Circuit reversed the order granting summary judgment on Head's conspiracy claim, finding that this Court misapplied applicable authority addressing what type of injury suffices to bring a § 1985(2) claim. *See* Opinion, ECF No. 139. The

Ninth Circuit stated that "we express no views as to the merits of Head's section 1985(2) conspiracy claim." *Id.* The Ninth Circuit also reversed this Court's ruling that Head failed to administratively exhaust his race-based claims and the denial of discovery under Rule 56(d). *See* Memorandum, ECF No. 140. The Ninth Circuit vacated the order granting summary judgment on Head's Title VII claims and remanded for further proceedings. *Id.* After discovery closed, the VA moved for summary judgment. *See* VA MSJ, ECF No. 177. Head filed an Opposition, and the VA filed a Reply. *See* VA Opp., ECF No. 180; *see also* VA Reply, ECF No. 182. Beiter and Norman likewise moved for summary judgment. *See* Beiter MSJ, ECF No. 176. Head filed an Opposition, and Beiter and Norman filed a Reply. *See* Beiter Opp., ECF No. 181; *see also* Beiter Reply, ECF No. 183. The Court held oral arguments and took the matter under submission.

## II.    EVIDENTIARY OBJECTIONS AND JUDICIAL NOTICE

As an initial matter, Head did not respond to Defendants' separate statement as required by the Court's standing order and did not address Defendants' undisputed facts. When asked about these discrepancies at the hearing, Head purported to dispute only Defendants' undisputed material fact number two. The parties further confirmed that Head does not rely on new evidence absent from the record when the Court adjudicated previous summary judgment motions. Relevant factual background—as recounted in prior summary judgment orders and below—is therefore undisputed.

Head submitted evidentiary objections, first arguing that Defendants' declarations should not be considered because they contain electronic signatures. *See* Pl.'s Evid. Obj., ECF No. 180-3. Defendants note that the VA submitted wet signatures on July 1, 2015 pursuant to a Court order. *See* Order Directing Parties to File Suppl. Briefing, ECF No. 60.[1] Head also objects to declarations and exhibits on grounds of

---

[1] Much of Head's briefing is unresponsive to the motions, copied from prior filings, and raises irrelevant issues, such as "further discovery is necessary on this topic…" *See* VA Opp. 20.  Except where noted, the Court does not address arguments or objections that do not respond to Defendants' grounds for summary judgment or are otherwise irrelevant to issues before the Court.

hearsay, lack of personal knowledge or foundation, and lack of authentication. Pl.'s Evid Obj. At the summary judgment stage, however, the Court is concerned with the *admissibility* of the relevant *facts* at trial, and not the *form* of these facts as presented in the motions. *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119-20 (E.D. Cal. 2006) (making this distinction between facts and evidence, Rule 56(e), and overruling objections that evidence was irrelevant, speculative and/or argumentative). "If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay." *O'Banion v. Select Portfolio Servs., Inc.*, 2012 WL 4793442, at *5 (D. Idaho Aug. 22, 2012) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003)). Head's objections are therefore deficient and overruled.

Defendants object to Head's supporting declarations. *See* Defs.' Evid. Obj., ECF No. 184. Most of the objections should be overruled for the same reasons noted above, but doing so is unnecessary because the Court does not rely on the disputed evidence to identify genuine issues of material fact. Defendants' objections are therefore overruled as moot.

The Court grants Defendants' unopposed Request for Judicial Notice, ECF No. 178, because it properly requests that the Court consider a verified complaint filed by Head in state court. *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1988) (taking judicial notice of pleadings filed in state court where the same plaintiff asserted similar and related claims).

## III.   FACTUAL BACKGROUND

This section is based on facts viewed in the light most favorable to Head. Head's allegations that are not asserted as uncontroverted facts or supported by admissible evidence—for example, allegations in the SAC or Head's Declaration with no supporting evidence—are not facts and cannot effectively dispute competent evidence supporting a contrary assertion.

From 2002 through 2013, Head held dual appointments at the VA and the University of California, Los Angeles ("UCLA"). Dr. Marilene Wang was also a dual UCLA/VA employee, and briefly supervised Head at the VA. On February 15, 2008, Head's position with the VA was converted to a full-time appointment in which Head was to spend 3/8 of his time as Associate Chief of Staff for QA and the remaining 5/8 of his time in two clinics and one surgery per week. On March 5, 2009, Head became Assistant Chief of Staff for Risk Management and was assigned to work on administrative tort claims, quality of care, and related risk management and patient safety issues. In a memo to Head, Norman wrote that this position would afford Head "an opportunity to develop [his] interests in health system administration." During his employment at the VA, Head has been involved in investigations and EEO actions against the VA as discussed below.

## 2005-06 Timecard Fraud Investigation Against Wang

On November 16, 2005, the Office of Inspector General ("OIG") Hotline received an anonymous phone call alleging that: **(1)** Wang was fraudulently verifying the time and attendance of a part-time physician who was at his private practice during his assigned VA tour of duty; **(2)** Wang did not submit leave slips for the times she was absent; and **(3)** on November 8, 2005, Wang left during a surgical procedure to perform duties at UCLA. OIG initiated an investigation. On April 12, 2006, OIG Administrative Investigator Nancy Solomon interviewed Head under oath using a tape recorder. Head testified regarding his understanding of Wang's clinic hours at UCLA, that he had no direct information regarding an instance where Wang left residents in surgery unattended so she could go work at UCLA, that he had a problematic relationship with Wang, and on other topics.

Head stated that Wang "said she would hold back [Head's] employment at the VA and that she would take every action possible to prevent [Head] from progressing at UCLA." In discussing his EEO complaint against Wang, Head stated that "initially, when [he] filed…you know, [Head is] black, but [Wang] never said, look, you're a

black guy, I'm going to get you." He also testified that after he gave his notes and a transcript of the encounter to the UCLA ombudsman's office, Wang went to "several faculty members" and said that "black people really shouldn't be at UCLA," that they "pull the hospital down," and that Head "should be at King Drew"—a "primarily minority," "downtrodden" county hospital.

### Head's 2004 EEO Complaint Against Wang

Head initiated EEO proceedings against Wang on March 11, 2004 on the bases of race (African American), color (Black), and reprisal (EEO involvement), identifying four incidents: **(1)** in November 2002, Wang denied Head "full-time equivalency" even though "Dr. Berke, Division Chief had assured" Head he would receive it; **(2)** in mid-December 2002, Wang denied Head laboratory space even though another doctor had "guaranteed" him the space; **(3)** in February 2004, Wang rated Head as "satisfactory" in an evaluation; and **(4)** on March 22, 2004, Wang requested that Head respond to a patient complaint after the time to respond had passed. Head did not formally pursue this administrative complaint.

### Head's 2008 EEO Complaint Against Stelzner

Head initiated an EEO Complaint against his then-supervisor Dr. Matthias Stelzner on July 16, 2008, asserting claims of reprisal and hostile work environment, alleging: **(1)** Stelzner interrogated Head on July 16, 2008 about leaving his duty station without permission; and **(2)** he was "not allowed research time" in March 2008. Stelzner responded that he met with Head to discuss an incident in which Head left his duty station without permission to work at UCLA. Stelzner also stated that all physicians on staff at the VA and UCLA are required to email their supervisors informing them when they leave to attend to patients at UCLA.

The EEO complaint lists the resolution sought for this claim as: "[c]ease harassment—wants to be free from 'combative meetings'"; "[i]ncreased time with Chief of Staff"; and "[d]iversity training for Dr. Stelzner." Stelzner responded that Head could not be given VA time for research because Head's research project was funded

by another entity and because Head's lab was located at UCLA. He also responded that the new physician was given 50 percent research time because all physicians are allowed time within their first two years of employment to gather data so they can write a research grant.

### Head's 2011 EEO Complaint Against Norman

Head initiated the operative EEO complaint on October 7, 2011, asserting a claim for "Harassment (non-sexual)/Hostile Work Environment" on the basis of "Reprisal (prior EEO activity)." The EEO Counselor's Report identifies ten "incidents of harassment and reprisal" that Head identified during a telephone interview:

1. Head was moved to the QA Program in August 2008;

2. Head's work hours were changed in July 2010;

3. Head was told that he would not be allowed to work from home in July 2010;

4. in July 2011, Head allegedly learned that "in 2006, a '*roast*' included slides of an '*obscene*' nature and photos taken by the OIG during an OIG investigation that pictured [Head] in an unflattering way";

5. on July 14, 2011, Head's QA duties were cut, he was given the new title of Assistant to the Chief of Staff, and his new duties put him under Norman's direct supervision;

6. on August 26, 2011, Head heard rumors from coworkers that management was planning "to do something to [him]";

7. on September 26, 2011, Norman told Head that "you're a bad doctor" and "you're never here";

8. on September 28, 2011, Norman was "very adversarial" when he asked Head to name his work hours;

9. on October 6, 2011, Norman told Head "I'm very worried about you"—which Head took as a "threat"; and

**10.** on October 25, 2011, Head was accused of not showing up for a surgical procedure at the VA and Norman gave orders to cut approximately $7,000 of Head's pay for being absent without leave ("AWOL").

Head filed a formal complaint of discrimination on November 23, 2011. On December 14, 2011, the Office of Resolution Management ("ORM") issued a Notice of Acceptance. ORM accepted all ten alleged events for investigation as part of a pattern of harassment. ORM also stated that the tenth incident is "accepted for investigation as an independently actionable claim. This event is sufficiently related to the overall pattern of harassment as it represents another action taken against you by your management officials and will be included for consideration in the analysis of the harassment claim." Head was interviewed about these complaints and his administrative complaint was completed on May 1, 2012. ORM dismissed as untimely events numbers 1, 2, 3, and 5—namely Head's assertions that he was reassigned to the QA Program, that his work schedule was changed in July 2010, that his request to work from home was denied, and that in July 2011 Head's duties and title were changed.

### The 2008 Investigation of Head

On September 10, 2008, the VA's Chief of Organization Improvement wrote a memo to the Chief of Staff with administrative findings of fact regarding Head and Stelzner. According to the memo, Stelzner alleged that Head had violated VA time and attendance policies by engaging in clinical activity at UCLA during his VA tour of duty. Head counter-alleged that Stelzner discriminated against him regarding his tour of duty, assignment of clinical and academic responsibilities, and annual proficiency evaluations. The memo also states that Head alleged that Stelzner harassed him about his time and attendance during a meeting to discuss these issues. The memo concludes that the only documented discrepancies in Head's time and attendance in relation to his VA tour of duty "fall within the category of providing emergency medical care at UCLA, consistent with the department policy and memorandum outlining the tour of duty." The memo finds that Head attempted to alert people in the department when he left to provide

emergency care at UCLA, although it acknowledges that Head may not have communicated about those instances as clearly as expected. The memo also states that the investigators did not find evidence that Head used sick leave while operating at UCLA, or that he systematically or fraudulently violated VA policy regarding his tour of duty or conflicts of interest. But the memo notes that the investigators did not have access to the complete operating room logs at UCLA. The memo states that there was a "significant difference in the tour of duty assigned to Dr. Head in comparison to the other members of the section. Dr. Head's tour of duty does not provide the flexibility of time or balance of assignments afforded to other members of the section." The memo continues:

> While we cannot determine if a rating of Satisfactory is appropriate for Dr. Head's proficiency evaluations, if Dr. Wang was responsible for the evaluations in violation of a previous agreement settling an EEO complaint, it would support the conclusion that this is a continuation of the previous difficulties that led to that agreement. Furthermore, not using consistent and clear criteria for evaluations throughout the department creates vulnerability for unfair and inconsistent evaluations.

The investigators found that "[a]lthough we conclude that Dr. Stelzner and Dr. Wang improperly treated Dr. Head differently than other members of the section, we do not know if that represented racial discrimination" because the investigators did not have enough information to determine Wang's and Stelzner's motivations. The investigators also recommended that: **(1)** Head and Stelzner should meet with the Chief of Staff to negotiate a new tour of duty and work assignment incorporating appropriate flexibility; **(2)** Head should submit his research protocols for GLA Research Service approval; **(3)** Head should review the relevant VA policies on time and attendance and conflict of interest to ensure that he understands them; and **(4)** the Chief of Staff should consider reassigning Head's full time equivalent ("FTE") to the Office of the Chief of Staff so that administrative supervision and final responsibility for Head's proficiency evaluation would fall under the Chief of Staff. On March 5, 2009, Head's title was changed to Assistant Chief of Staff for Risk Management. In his memo to Head,

Norman stated that he was "pleased that you are joining my office on a full time basis" and that in his new capacity Head would work with Norman and Dr. Michael Mahler, who would be Head's direct supervisor.

### The November 2010 Reorganization and Relocation of Head's Office

On November 15, 2010, Norman issued a memo to Head stating that because Mahler would be focusing his efforts on Organizational Performance and Improvement, Norman was reorganizing responsibilities within the Chief of Staff's office. Head would thus report directly to Norman. Norman's memo also states that Head's tour of duty includes 80 scheduled hours of work per two-week pay period. It further states that any time spent performing surgery and treating clinic patients at UCLA must be scheduled outside of his full time VA tour of duty. The memo instructs Head to notify Norman in advance when Head planned to take leave and as soon as possible if Head must take unscheduled leave. Finally, the memo informs Head that if he needed to treat a non-VA patient during his VA tour of duty, he could take a personal leave day or request a change of tour. Head was assigned to share an office with Program Analyst Darryl Joseph next to Norman's office within the GLA Executive Suite on the sixth floor of the main hospital.

### Head's Performance and Norman's Actions in 2011

On February 22, 2011, Norman received an email from VA Regional Counsel Ken La Faso, who reviewed malpractice claims against the VA. According to La Faso's email, Regional Counsel is given six months to investigate and make decisions regarding tort claims, after which the claimants are free to file suit in federal court. La Faso's email asserts that as of that date there were twelve claims in which he was waiting for initial reviews by Head, and that the average time initial reviews have been pending was 4.2 months. Around when Norman received La Faso's email, Head's attendance in the Executive Suite had become increasingly infrequent. Norman therefore asked his assistant, Ms. Blaisdell, to prepare status updates for his weekly meetings with Head. These status updates were to include notes about Head's time and

attendance records and about Head's responses to pending medical record reviews, medical malpractice tort claims, and appeal requests to which Head had been assigned. On June 23, 2011, La Faso wrote to Joseph that he had not heard from Head regarding the February 22 list and that there were three additional cases that Head needed to review. On June 26, 2011, Norman documented that Head did not appear for their scheduled meeting, that Regional Counsel told Norman that Head had not been responding to emails for several months, and that Head had not taken any action to become a member of the bioethics committee even though Norman had asked him to do so. In her notes from June 30, 2011, Blaisdell wrote that Head had not been in the office from May 18 through May 25, 2011, and had not entered any leave requests for that period. She also wrote that Head was not present in the office on June 20, 23, 27, and 29 of 2011. She also noted that on June 23, 2011, Head failed to appear for his scheduled meeting with Norman or to call the office. On July 14, 2011, Norman issued another memo to Head dictating his regular office hours on his VA administrative days. Norman stated that he needed to modify Head's administrative responsibilities because of changes in Norman's overall assignment and responsibilities. Norman specified hours during which Head must be present in his VA office. On July 17, 2011, Norman showed Head a slide that depicted a picture of Head with his middle finger raised with the caption, "If all else fails, call 1-800-488 VAIG" (the "VAIG slide"), which was shown at a June 2006 UCLA roast. Head complained that: **(1)** Wang made disparaging remarks about Black Americans; **(2)** his salary had stopped; **(3)** clerks were being told not to schedule patients to see him; **(4)** an attempt was made to block Head's promotion; and **(5)** UCLA is calling Head a liar. Norman promised to speak with UCLA Vice Chancellor Dr. Thomas Rosenthal regarding the VAIG slide and to request a search of the VA servers for a photo shown at the roast in which Head's face was superimposed on a gorilla, which was depicted being sodomized by his supervisor, Dr. Gerald Berke (the "Gorilla slide"). Norman was told that UCLA did not have the slide and that it was not found on the VA servers.

1   Head failed to come to work or call to notify the hospital of his absence and was

2   marked AWOL fourteen times in 2011: July 22, July 27, September 7, September 9,

3   October 11, October 14, October 19, October 24, October 25, October 26, October 28,

4   November 1, November 2, and November 4. On November 10, 2011, Blaisdell

5   completed a "report of contact" with Head regarding Head's time and attendance issues.

6   Blaisdell asserts that Head complained that his check was "short $6,000," that he had

7   been "speaking at an NAACP event," and that he had "been on emergency call at UCLA

8   for three weeks." Head further told Blaisdell that the tour of duty outlined in Norman's

9   memorandum was "not workable for him." Blaisdell's report states that Head forwarded

10  to her an email which would purportedly "confirm what he had told [Blaisdell]

11  regarding his being on emergency call at UCLA and confirming Dr. Norman's

12  agreement that he would be paid." On November 11, 2011, Dr. Thomas Yoshikawa—

13  who was then the Acting Chief of Staff because Norman was on leave—wrote to Head

14  regarding Head's time and attendance issues. Yoshikawa wrote that Blaisdell had

15  complained about Head's interaction with her and directed Head to no longer

16  communicate with her. Yoshikawa also wrote that he had received a copy of the July

17  2011 memorandum from Norman to Head outlining his hours and duties and that "[w]e

18  need to discuss this because it is inconsistent with what you convey[ed] to me yesterday

19  over the phone (your VA work days and hours)." On December 5, 2011, Norman

20  restored Head's time marked AWOL. Head told Norman that he was in financial

21  distress and that his house was in foreclosure. On December 12, 2011, Norman issued

22  written counseling to Head clarifying Head's tour of duty, stating:

23  　　　During the past weeks, there were a number of occasions where you did
24  　　not report for duty in the Chief of Staff administrative suite in accordance
        with the schedule I outlined for you in writing on July 14, 2011. You did
25  　　not contact me, or another leave supervisor, regarding your absence. You
        did not arrange a change in the expectations of your tour with me, and I
26  　　could not determine that you were otherwise engaged in activity for which
27  　　compensation by the VA would be appropriate.

28

**Head's 2014 Congressional Testimony and Subsequent Reassignment**

On July 8, 2014, Head provided written and oral testimony to the House Committee on Veterans Affairs on a panel entitled "VA Whistleblowers: Exposing Inadequate Service Provided to Veterans and Ensuring Appropriate Accountability." Among other things, Head testified that he was retaliated against for participating in a 2006 OIG investigation and Head testified about the June 2006 slide show. Beiter was Head's second line supervisor when Head testified and watched Head's testimony and read his written statement. Beiter interpreted Head's statements as criticism of her leadership and learned that the VA Administrative Investigative Board was initiating an investigation of Head's "whistleblower" allegations. Beiter therefore decided that Head should not be within her supervisory chain of command until after the investigation terminated. Beiter contacted her supervisor, Jeff Gering, and it was decided that Head should report to Long Beach Chief of Staff Norman Ge until after the investigation. Head claimed that Ge was a good friend of Norman and that the decision to transfer Head to Ge was a retaliatory action meant to enable Norman to continue "carry[ing] out his retaliatory behavior through Dr. Ge." Head's office was moved from the Executive Suite (where Norman's and Beiter's offices were located) to a private office on the VA's fourth floor. Norman and Beiter assert that these decisions were made shortly after Head's testimony, and that neither person knew that Head had personally named them in this lawsuit when the decisions were made.

**Head's Complaints and Lawsuit Against UCLA**

On April 20, 2011, Head filed his first Department of Fair Employment and Housing ("DFEH") complaint against UCLA, asserting that he was discriminated against based on race and association with others who are African American and older workers, and based on retaliation "for having filed a complaint at the VA EEO and for cooperating in an investigation by the IG against some physicians who are UCLA doctors." Head's second complaint cited the Gorilla slide. Head also complained that Wang had "published disparaging and defamatory statements about him," and had

"falsely refer[ed] to him as a bad doctor, a bad researcher, and a bad mentor to residents and hospital staff." On April 17, 2012, following additional complaints, Head sued the Regents of the University of California (the "Regents"), Berke, and Wang. On May 14, 2013, Head filed a verified third amended complaint ("verified TAC") against the Regents, Berke, Wang, and several other individual doctors. Among other things, the verified TAC asserted claims based on the Gorilla slide and the VAIG slide. Head settled the UCLA lawsuit and dismissed with prejudice all of the UCLA defendants, including Wang.

## IV.   LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

14

# V.  DISCUSSION

## A.  **Conspiracy**

42 U.S.C. § 1985(2), in relevant part, proscribes conspiracies "to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified." If one or more persons engaged in such a conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy,…the party so injured…may have an action for the recovery of damages occasioned by such an injury…against any one or more of the conspirators." 42 U.S.C. § 1985(3).

Head contends that Norman and Beiter violated 42 U.S.C. § 1985(2) by conspiring to "deter Plaintiff, by force intimidation or threat from participating in legal proceedings." *See* Beiter Opp. 20. Head has specifically alleged that Beiter and Norman conspired to deter him from testifying in the case of his former colleague, Bowers, and in his own case. Yet Head cites no evidence suggesting that he was prevented from testifying in this lawsuit, Bowers' administrative complaint and lawsuit, his UCLA administrative complaints and lawsuit, his congressional testimony, or any other matter that could conceivably form the basis of a conspiracy claim. *Ellington v. House*, 2019 WL 4196319, at *15 (C.D. Cal. July 23, 2019) ("Plaintiffs have not presented any evidence of a conspiracy to deter them from attending court or testifying in any pending matter; indeed, the allegations in the Complaint reflect that Plaintiffs have been actively involved in the probate matter and have challenged the proceedings on numerous occasions."). Quite the reverse, the record shows that Head's ability to testify or otherwise participate in all relevant proceedings was unimpeded, and that Head in fact freely participated in these matters.

Head's counsel clarified at the hearing that Head's conspiracy claim is premised on Norman and Beiter moving Head's office out of the executive suite to an inferior office after Head's July 8, 2014 congressional testimony. But given the undisputed facts

15

before the Court, Head's accusation amounts to nothing more than "bare allegations" and "rank conjecture" insufficient to support a conspiracy claim under § 1985. *AREI II Cases*, 216 Cal. App. 4th 1004, 1022 (2013) ("It is well settled that '[b]are allegations and rank conjecture do not suffice for civil conspiracy.'") (internal quotations and citation omitted). Head cites no evidence to even suggest a conspiracy involving Norman or Beiter, let alone competent evidence that Head's relocation stemmed from a plot to impede Head's rights or punish him for testifying. *Avalos v. Baca*, 517 F. Supp. 2d 1156, 1170 (C.D. Cal. 2007) ("Here, plaintiff has presented no evidence to support the existence of an agreement or meeting of the minds between defendants, whether the agreement be specific or inferred from conduct, nor does he provide any evidence that the deprivation of his rights was the *result* of such an agreement."), *aff'd*, 596 F.3d 583 (9th Cir. 2010).

Head's failure to come forth with admissible conspiracy evidence is compounded by his failure to dispute that he was moved to advance the propriety of the investigation *before* Beiter or Norman knew they were named in this lawsuit. *Mustafa v. Clark Cnty. Sch. Dist.*, 157 F.3d 1169, 1181 (9th Cir. 1998) (summary judgment appropriate where plaintiff "cited no instances of ethnic animus on the part of…anyone [] in the school management" and no "evidence of any agreement…to violate his constitutional rights.") (citation omitted). As Head has not demonstrated a genuine issue of material fact regarding the existence of a conspiracy, the Court grants summary judgment for Norman and Beiter on Head's conspiracy claim. *Id.* The Court need not reach Defendants' alternative preemption argument.

## B. Timeliness

Federal regulations promulgated by the EEOC require a federal employee complaining of discrimination by a government employer to "consult a Counselor prior to filing a complaint" and to "initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a). The regulations extend this time limit "when the individual shows that he or she was not

notified of the time limits and was not otherwise aware of them…[or] that he or she did not know and reasonably should not have been [sic] known that the discriminatory matter or personnel action occurred." 29 C.F.R. § 1614.105(a)(2). "[F]ailure to comply with this regulation has been held to be fatal to a federal employee's discrimination claim." *Lyons v. England*, 307 F.3d 1092, 1105 (9th Cir. 2002). The 45 day time limit "is not jurisdictional, but operates as a statute of limitations defense." *Armstrong v. Reno*, 172 F. Supp. 2d 11, 20 (D.D.C. 2001) (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)). "Thus, the burden is on the defendant to prove that administrative remedies were not exhausted." *Id.* (citation omitted). Once the defendant makes such a showing, the burden shifts to the plaintiff to prove that equitable defenses, such as equitable tolling, apply. *Id.* (citation omitted).

Defendants admit for summary judgment purposes that Head initiated contact in July 2011 and argue that Head's complaints of events in 2006, 2008, and 2010 are untimely under 29 C.F.R. § 1614.105(a), which bars Head's complaints based on events before May 2011. *See* VA MSJ 10-12. Defendants therefore argue that the following events are time-barred:

1. Head was moved to the QA Program in August 2008;

2. Head's work hours were changed in July 2010;

3. Head was told that he would not be allowed to work from home in July 2010;

4. Head allegedly learned in July 2011 learned that "unflattering" photographs of him were shown at a 2006 UCLA "roast." The VAIG slide is the only such photograph allegedly at issue in this lawsuit.

Head does not substantively dispute that the first three events are time-barred, but contends that the fourth event is not. As the event occurred in 2006, Head must demonstrate an equitable defense to avoid dismissal of this event. 29 C.F.R. § 1614.105(a)(2) (requiring the individual to show that the 45-day time limit should be extended for equitable reasons). As in prior summary judgment briefing, Head argues that "it was not until 2011 when Plaintiff realized Dr. Wang's role in the offensive slide

show and how the slide show related to Plaintiff's previous EEO complaints against Wang." *See* VA Opp. 2. Even if true, this contention demonstrates at most that Head failed to appreciate the slide's discriminatory nature when he saw it in 2006—it does not support an equitable defense. *See, e.g., Noland v. City of Albuquerque*, 779 F. Supp. 2d 1214, 1229 (D.N.M. 2011) ("Equitable tolling 'is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose.'") (quoting *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1235 (10th Cir. 1999)); *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1216 (5th Cir. 1992) ("[E]quitable estoppel is not warranted where an employee is aware of all of the facts constituting discriminatory treatment but lacks direct knowledge of the employer's subjective discriminatory purpose."); *Bruno v. Brady*, 1992 WL 57920, at *4 (E.D. Pa. Mar. 16, 1992) ("Plaintiff's contention that the limitations period should be tolled until the date she alleges to have become subjectively 'aware' that she had been discriminated against fails to state a recognized basis for equitable tolling."). Head nonetheless argues that he did not process the contents of the VAIG slide because he experienced "shock and disgust" when he subsequently saw the Gorilla slide. The Court previously rejected this inconsistent theory as grounds to defeat summary judgment and does so again here. *See* MSJ Order 2, at 5 ("The VAIG slide was shown before the Gorilla slide because the Gorilla slide was the last slide in the presentation. Plaintiff testified that the audience laughed when they saw the Gorilla slide and this somehow hindered his ability to grasp the import of the VAIG slide. But Plaintiff offered no explanation for how the laughter resulting from the Gorilla slide could have affected his ability to view and comprehend the VAIG slide displayed earlier in the presentation."). Head's recycled argument and unsupported assertions do not overcome the fact that he was actually aware of the VAIG slide in 2006.  Head's "delayed discovery" theory provides no grounds for equitable tolling.

Head further contends, as in prior summary judgment briefing, that the 45-day requirement should be extended because someone in the Office of Special Counsel ("OSC") told him that he did not need to file an EEO complaint. *See* VA Opp. 6. The VA submits evidence that the 45-day requirement was announced on posters in various locations of the GLA campus—the same evidence this Court found sufficient to rule that Head "had, at a minimum constructive notice of the requirement and fails to show that he is entitled to equitable tolling based on a lack of knowledge of the 45-day requirement." *See* MSJ Order 2, at 5-6 (citing *Johnson v. Henderson*, 314 F.3d 409, 415, n.4 (9th Cir. 2002) (finding evidence of informational posters' presence in multiple locations sufficient to show notice)). The Court continued:

> Even if there were no posters announcing the 45-day requirement it is somewhat farcical for Plaintiff to assert that he was unaware of the requirement. Plaintiff filed two prior EEO complaints during his employment with the VA, in 2004 and 2008. He also admitted that he has taken bi-annual No FEAR EEO training offered by the VA, since 2008. Martinez testified that she informed Plaintiff of the 45-day requirement in July/August 2011. And even if Plaintiff does not recall Martinez stating the 45-day requirement, the Court finds it implausible that Plaintiff was not made aware of the 45-day requirement on one of his multiple contacts with ORM, during his employment with the VA.

*Id.* at 6.

Head does not address the VA's evidence or this Court's prior determination. The Court reaffirms that determination and finds that Head knew or should have known of the 45-day requirement well before May 2011 and could not have reasonably relied on the statement of an unnamed individual in the OSC to delay the date of initiating contact with an EEO Counselor.

## C.    **Head's Post-Charge Allegations**[2]

---

[2] Head's Opposition lists allegations in the SAC to argue that Defendants retaliated after Head filed his EEO Complaint. *See* VA Opp. 13. Unless otherwise noted, this Order only addresses allegations with accompanying evidence or those made in Head's Declaration.

Head lists instances of alleged retaliation after the EEO investigation terminated on May 1, 2012, including: **(1)** Beiter and Norman "took approximately 60-100 days of sick leave time" and "80-90 days of vacation time from me"; **(2)** Beiter and Norman "have made untrue and disparaging comments to other VA staff members about me claiming that I am lying"; **(3)** Defendants took "patients away from" Head and reassigned them to Wang; **(4)** Beiter and Norman defamed Head; and **(5)** Head's transfer of supervision from Norman to Ge. *See* Head Decl. ¶¶ 15, 22, ECF No. 180-4. As in previous summary judgment briefing, Head proffers no evidence to support these bare allegations, and some of them are belied by available evidence. As the Court previously determined with respect to the first allegation, there "is no admissible evidence substantiating this claim," and as to second allegation, Head "only asserts that that such disparaging comments were made to third parties," which "the Court cannot rely on for purposes of summary judgment." *See* MSJ Order 3, at 7-9. And as to the third allegation:

> Plaintiff provides no evidence that allows the inference that Plaintiff's loss of patients was retaliatory… Plaintiff does not state what events actually occurred or who actually made the decision to take away his patients. Plaintiff has not introduced any evidence, such as the identity of the decision maker or their knowledge of Plaintiff's protected activity… The scant details in this claim, a single vague sentence only supported by Plaintiff's own declaration, cannot defeat summary judgment.

*Id.* at 9. And as to the fourth allegation, "it is unclear what Plaintiff means by this assertion" and "Plaintiff does not cite to any specific evidence for this proposition." *Id.* at 8.

Finally, as to the fifth allegation, the Court noted:

> Plaintiff only offers that his reassignment to a new supervisor (Dr. Ge) is adverse inasmuch as Ge is 'good friends' with his old supervisor (Dr. Norman). Though, this action could potentially be adverse under certain factual scenarios, Plaintiff has not provided any context that could lead a fact finder to find this action was adverse. At the very minimum, Plaintiff would need to provide some evidence, or even allege, that this action was

actually adverse (i.e. that it had a negative effect on Plaintiff). If anything, this was a very favorable action. Plaintiff has spent several years devoting substantial time and resources to showing that Dr. Norman has mistreated him. There is not a single allegation that Dr. Ge has injured Plaintiff in any way. Thus, there is not even a scintilla of evidence that this reassignment was adverse.

*Id.* at 10.

Despite ample opportunity to take additional discovery and address deficiencies identified by the Court, Head offers no proof to support his declaration's aforementioned allegations, let alone evidence to survive summary judgment as to these claims. In sum, except for those claims discussed below, Head has come forth with no admissible evidence to substantiate his post-charge complaints, and the Court need not consider Defendants' alternative exhaustion argument as to these deficient complaints.

## C.    Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must show that the "workplace [was] permeated with discriminatory intimidation…that [was] sufficiently severe or pervasive to alter the condition of [] employment and create an abusive working environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "The working environment must both subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995) (citing *Harris*, 510 U.S. at 21-22). Courts use a totality of the circumstances test to determine whether allegations make out a colorable hostile work environment claim. *Harris*, 510 U.S. at 23. Hostile work environment claims encompass "a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. § 2000e-5(e)(l)). Thus, the Court may consider acts that, by themselves, would fall outside the time period provided for when a charge must be filed with the EEOC. *Id.* at 118. However, all acts the Court considers must be part of the same hostile work environment claim. *Id.* (explaining that if the timely act had no

relation to previous acts, or for some other reason the other acts were no longer part of the same claim, "the employee cannot recover for the previous acts").

Under a totality of circumstances, the Court finds that Defendants' conduct was not "sufficiently severe or pervasive to alter the conditions of [] employment and create an abusive working environment." *Brooks*, 229 F.3d at 923 (quoting *Harris*, 510 U.S. at 21). "When compared to other hostile work environment cases, the events in this case are not severe or pervasive enough to violate Title VII." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003). Courts have found a hostile work environment claim actionable when plaintiff endures "an unrelenting barrage of verbal abuse." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105 (9th Cir. 1998) (supervisor made repeated sexual remarks about plaintiff over a two-year period). A few negative comments is not enough. *Vasquez*, 349 F.3d at 643 (two derogatory comments insufficient); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1107 (9th Cir. 2000) (no hostile work environment when supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on many occasions).

In arguing that "Plaintiff's Hostile Work Environment is Proper," Head refers generally to "allegations of discriminatory intimidation, ridicule, and insult" in his SAC and states that they "paint a picture of harassment against Plaintiff that is not only severe but pervasive." *See* VA Opp. 14. Without citing evidence, Head concludes that "the allegations show that harassing behavior against Plaintiff has been pervasive and ongoing since 2003." *Id.* The Court is left to guess what admissible summary judgment evidence Head relies on to establish a hostile work environment. At the hearing, Head's counsel clarified that moving Head's office from the executive suite, making "false accusations that he was never there," reducing Head's pay, and marking Head AWOL created a hostile work environment. But the alleged negative actions of reducing QA duties, moving Head's office, and marking Head AWOL are not nearly enough to find that the "workplace [was] permeated with discriminatory intimidation." *Brooks*, 229

F.3d at 923 (alteration in original) (quoting *Harris*, 510 U.S. at 21). And Head's 2011 complaint details only one objectively negative comment from Dr. Norman: "You're a bad doctor." Head otherwise alleges comments, conduct, and rumors—such as "I am worried about you" and Norman being "very adversarial" when asking about Head's work hours—that are not necessarily negative and certainly less egregious than the non-actionable conduct in *Vasquez* or *Kortan*.

Recognizing that no action taken by Norman detailed in Head's 2011 complaint demonstrates a hostile work environment, Head attempts to resurrect allegations against Wang made in 2004 and others against Wang in her UCLA capacity. The Court previously rejected this obfuscation:

> Here, the vast majority of Plaintiff's proffered evidence both has no relation to the timely filed acts and are not part of the same claim due to intervening actions by the employer. Plaintiff alleges several grievances against Dr. Wang, however Plaintiff filed his EEO complaint against Dr. Wang in 2004. Plaintiff was then reassigned to a different supervisor, Dr. Stelzner. In 2008, Plaintiff filed an EEO complaint against Dr. Stelzner— which specifically requested that Plaintiff receive "increased time with Chief of Staff [Norman]." Plaintiff was then reassigned to Dr. Norman. There is no evidence that Plaintiff's complaints against Wang and Stelzner are related to Dr. Norman. There is evidence, however, that intervening causes—such as the reassignment of Plaintiff to various supervisors— shows that these events are not part of the same hostile work environment claim. Plaintiff had the opportunity to pursue his claims against Wang and Stelzner, and he did. The remaining claim against Dr. Norman, based on Plaintiff's 2011 EEO complaint, does not grant Plaintiff carte blanche to rely on all possible grievances that occurred against him within the last fifteen years to defeat summary judgment. He must rely on relevant evidence that creates a genuine issue of material fact.

MSJ Order 4, at 6 (citations omitted).

The Court reaffirms that only those matters that related to Head's 2011 EEO Complaint are in question and that those matters raise no genuine issue for trial concerning the existence of a hostile work environment. The Court therefore grants summary judgment as to Head's hostile work environment claim in Defendants' favor.

### D.   Disparate Treatment

Title VII prohibits employers from discriminating against an employee based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). An employee suffers "disparate treatment" under Title VII when he is "singled out and treated less favorably than others similarly situated" because of his membership in a protected class. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121 (9th Cir. 2004) (internal quotations omitted). To prove disparate treatment under Title VII, a plaintiff must first establish a prima facie case by showing that "(1) she belongs to a protected class, (2) she was qualified for the position in question, (3) she was subject to an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably." *Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). If a plaintiff establishes these factors, the *McDonnell Douglas* framework applies, and the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. *Id.* If the defendant provides such a reason, the burden shifts to the plaintiff to show that the employer's proffered reason were not its actual reasons, but a pretext for discrimination. *Id.*

The VA argues that summary judgment is warranted on Head's Title VII claims because—among other reasons—Head has not and cannot point to evidence demonstrating that similarly situated employees outside of his protected class were treated more favorably.  *See* VA MSJ 12-13 (citing *Campbell*, 892 F.3d at 1015 ("[T]he record is devoid of evidence that any similarly situated employees of a different race or sex were treated more favorably than Campbell was.")). Head did not address this argument and conceded at the hearing that there is no evidence of different treatment to similarly situated individuals outside Head's protected class. A review of the record reveals that Head comes forth with no competent evidence even identifying comparators outside his protected class during a relevant period, let alone that they received more favorable treatment. Head's failure to present evidence of more favorable treatment to similarly situated individuals outside his protected class leads the Court to

conclude that Head has presented no genuine issue of material fact to support the fourth element of his *prima facie* case, warranting summary judgment on Head's Title VII claims irrespective of additional elements.

Even if Head established a *prima facie* case, the VA has presented legitimate, nondiscriminatory reasons for any alleged adverse employment actions. For example, although Head complained about his altered duties and title, the record shows that Norman simply issued a memo reiterating Head's usual hours on his VA administrative days due to Head's repeated absences. The VA further points to undisputed declarations establishing that marking Head AWOL was due to documented attendance issues. It is undisputed, for example, that Norman was informed by his assistant that Head was absent on June 20, 23, 27, and 29, 2011. It is also undisputed that on October 29, 2011, Norman recorded that Head had failed to appear for office hours for three weeks and that Head had not performed his job duties. Head offers no competent evidence or authority to counter the VA's substantial evidence demonstrating that VA has satisfied the second *McDonnell Douglas* step. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (a defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.") (citations omitted). The VA has therefore offered legitimate, nondiscriminatory reasons for taking the challenged actions and the Court will proceed to the final stage of the *McDonnell Douglas* framework.

To satisfy the third *McDonnell Douglas* step, Head must point to "substantial additional evidence from which a trier of fact could infer the articulated reasons for the adverse employment action were untrue or pretextual." *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1113 (2007). Under this standard, summary judgment should be granted "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v.*

1    *Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) (citations omitted).

2           When asked for evidence of pretext at the hearing, Head's counsel relied on

3    statements made by Wang that the Court already determined are not germane to the

4    instant summary judgment analysis. Head's Opposition and supporting documents set

5    forth uncited statements in support of the contention that the VA's proffered legitimate

6    reasons are pretextual but offer no *admissible* material that effectively counteracts the

7    evidence presented by the VA in support of its aforementioned legitimate,

8    nondiscriminatory justifications. Head's subjective beliefs are insufficient to satisfy his

9    burden. Accordingly, the Court concludes that Head does not provide admissible

10   evidence from which a trier of fact could conclude that the VA's proffered

11   nondiscriminatory justifications are pretextual. *Villiarimo v. Aloha Island Air, Inc.*, 281

12   F.3d 1054, 1063 (9th Cir. 2002) (in considering an employer's proffered reason for

13   adverse employment action, "courts only require that an employer honestly believed its

14   reason for its actions, even if its reason is foolish or trivial or even baseless.").

15          Hence, even if Head could make out a *prima facie* case for discrimination,

16   summary judgment is proper. The Court therefore grants summary judgment on Head's

17   Title VII discrimination claims in Defendants' favor.

18          **E.    Retaliation**

19          Head's retaliation claim is also subject to the *McDonnell Douglas* three-step

20   analysis. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008). A *prima*

21   *facie* case of retaliation consists of a showing that (1) plaintiff was engaged in an activity

22   protected under Title VII, (2) the employer subjected plaintiff to an adverse employment

23   decision, and (3) there was a causal link between (1) and (2). If a plaintiff can establish

24   a *prima facie* case of retaliation, the defendant employer then has the burden of

25   producing a legitimate, nonretaliatory reason for the employment decision. *Id.* If this

26   burden is satisfied, the burden then shifts back to plaintiff to show that defendant's

27   proffered legitimate reason is pretextual. *Id.* As with a discrimination claim, a plaintiff

28   proving pretext via circumstantial evidence must offer specific and substantial evidence

1  of pretext. *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d

2  1136, 1142 (9th Cir. 2001). To establish an adverse action for purposes of a Title VII

3  retaliation claim, a plaintiff must show that "a reasonable employee would have found

4  the challenged action materially adverse,' meaning 'it might well have dissuaded a

5  reasonable worker from making or supporting a charge of discrimination.'" *Leland v.*

6  *City & County of San Francisco*, 576 F. Supp. 2d 1079, 1097 (N.D. Cal. 2008) (quoting

7  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Thus, "normally

8  petty slights, minor annoyances, and simple lack of good manners" are ordinarily not

9  actionable adverse events because they ordinarily "will not create such dependence."

10  *White*, 548 U.S. at 68.

11      Head fails to demonstrate a *prima facie* case of retaliation because he proffers no

12  evidence that a protected activity caused an adverse action. *Univ. of Tex. Sw. Med. Ctr.*

13  *v. Nassar*, 570 U.S. 338, 524–25 (2013) (plaintiff asserting a retaliation claim must

14  establish that the protected activity was a "but-for" cause of the alleged adverse action).

15  As recounted above, Head made the EEO complaint against Norman on October 7, 2011

16  and other EEO complaints in 2004 and 2008. Head must therefore show that any

17  retaliatory action taken before October 7, 2011 was in response to his 2004 or 2008

18  complaint. While Head avers that Norman retaliated due to Head's complaint against

19  Wang in 2004 and Stelzner in 2008, he cites no evidence to support these accusations,

20  let alone evidence sufficient to rebut the significant proof that Head being marked

21  AWOL and the other alleged adverse actions had no retaliatory element. The lengthy

22  passage of time since Head's 2008 EEO complaint is further evidence that there is no

23  causal connection between the challenged actions and Head's protected activity. *Manatt*

24  *v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003). Head offers nothing more than

25  conjecture and subjective beliefs to suggest that his protected activity was the "but-for"

26  cause for any of the actions of which he complains. Without persuasive argument from

27  Head, the Court finds there is no triable issue concerning whether the complained-of

28  actions were due to Head's protected activity. Head therefore fails to establish a *prima*

*facie* case of retaliation, warranting summary judgment on that claim.

As discussed above regarding Head's discrimination claim, even if Head could establish a *prima facie* case, the VA has provided legitimate, nonretaliatory reasons for the alleged adverse employment actions. And Head has not satisfied his burden of showing that the VA's proffered reasons are pretextual. Indeed, uncontroverted evidence submitted by the VA, discussed above, further supports that the VA's proffered nondiscriminatory reasons were not pretextual. The Court therefore grants summary judgment on Head's retaliation claim in Defendants' favor.

## VI.    CONCLUSION

Defendants' motions are granted. Judgment is hereby entered in favor of Defendants and against Plaintiff. This Order shall constitute notice of entry of judgment pursuant to Federal Rule of Civil Procedure 58. Pursuant to Local Rule 58-6, the Court orders the Clerk to treat this order, and its entry on the docket, as an entry of judgment.

**IT IS SO ORDERED.**

Dated: July 16, 2021

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE